614 A.2d 1086

Constance B. FOSTER, Insurance Commissioner
of the Commonwealth of Pennsylvania

v.

The MUTUAL FIRE, MARINE AND INLAND
INSURANCE COMPANY.

Appeal of COMMITTEE OF POLICYHOLDERS
at Nos. 28/71 1989.

Appeal of COLONIAL PENN GROUP, INC. at No. 15/90.

Appeal of ALLSTATE INSURANCE COMPANY at No. 16/90.

Appeal of AIG RISK MANAGEMENT, et al. at No. 17/90.

Appeal of PEPSI–COLA BOTTLING CO. OF
CHARLOTTE, INC., et al. at No. 18/90.

Appeal of FIREMAN'S FUND INSURANCE CO. and
Interstate Fire and Casualty Co. at No. 19/90.

Appeal of COMMITTEE OF POLICYHOLDERS at No. 20/90.

Appeal of EVANSTON INSURANCE CO. at No. 21/90.

Appeal of RLI INSURANCE CO. at No. 22/90.

Appeal of PA. INSURANCE GUARANTY
ASSN. (PIGA) at No. 23/90.

Appeal of The MEMBER COMPANIES OF the REPUBLIC
INSURANCE GROUP, et al. at No. 24/90.

Supreme Court of Pennsylvania.

Argued May 8, 1990.

Decided Aug. 21, 1992.

600

602

Harold E. Kohn, David H. Weinstein, Robert S. Kitchenoff, Philadelphia, Richard A. Brown, Spencer L. Kimball, Washington, D.C., Pro Hac Vice, for appellants in No. 28/71.

David L. Cohen, Darryl J. May, Walter M. Einhorn, Jr., Philadelphia, for appellants in No. 15/90.

Robert E. Kerper, Jr., Joseph F. Hutchinson, Jr., Marc B. Merklin, Akron, Ohio, Pro Hac Vice, for appellants in No. 16/90.

Marcy B. Tanker, Philadelphia, for appellants in No. 17/90.

Robert J. Donaghy, Newtown, for appellants in No. 18/90.

Warren L. Dennis, Washington, D.C., for appellants in No. 19/90.

Harold E. Kohn, David H. Weinstein, Robert S. Kitchenoff, Philadelphia, Richard A. Brown, Spencer L. Kimball, Washington, D.C., Pro Hac Vice, for appellants in No. 20/90.

Edward C. German, Kathleen M. Carson, Philadelphia, for appellants in Nos. 21/22–90.

Carl M. Martin, II, Philadelphia, for appellants in No. 23/90.

Edward F. Mannino, James D. Morris, Philadelphia, for appellants in No. 24/90.

Kathleen E. Torbit, Philadelphia, Richard DiSalle, Roger Curran, Susan Hileman Malone, Bruce C. Fuchs, Pittsburgh, for C.B. Foster, Ins. Com. of Comm. in Nos. 28/71–1989.

Robert H. Levin, Myron A. Bloom, Debbie S. Buchwald, Philadelphia, for C.B. Foster, Ins. Com. of Comm. in Nos. 15–24–1990.

Richard C. Biedrzycki, Philadelphia, for Excess Mut. Reinsurance Co.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

NIX, Chief Justice.

This is an appeal from the Order of the Commonwealth Court modifying, and then approving, a Rehabilitation Plan ("Plan") for Mutual Fire, Marine and Inland Insurance Company ("Mutual Fire") submitted by Appellee, Constance Foster, Insurance Commissioner of the Commonwealth of Pennsylvania ("Commissioner or Rehabilitator"), pursuant to Section 515(a) of Article V of the Act of May 17, 1921, P.L. 789, *as amended,* by the Act of December 14, 1977, P.L. 280, 40 P.S. § 221.15 (known as the Insurance Department Act of 1921). While numerous Appellants challenge the Plan on multiple and varying grounds, the threshold issue to be resolved is whether the Plan as submitted legally represents a legitimate plan of Rehabilitation or whether the Plan, in reality, is a *de facto* liquidation plan, filed by the Rehabilitator lacking any rehabilitative purpose, thus constituting an abuse of her discretion. Should this Court find that the proposed Plan represents a liquidation instead, the numerous appeals herein, which challenge specific provisions of the Plan of rehabilitation, would be rendered moot.

## FACTS

The facts, as presented in the opinion of the Commonwealth Court, have been adopted and incorporated for our purposes herein.

In December 1986, George F. Grode, then Commonwealth Insurance Commissioner, sought, with the consent of Mutual Fire's officers and directors, appointment as Rehabilitator of Mutual Fire, Section 515(a) of the Act, 40 P.S. § 221.15(a), and submitted a rehabilitation plan. Prior to this petition, Com-

missioner Grode had placed Mutual Fire under his supervision. Section 510(d) of the Act, 40 P.S. § 221.10(d). At the time the petition was filed, Mutual Fire reported assets of $99.4 million and total liabilities of $260.1 million, with a negative policyholders' surplus of nearly $161 million.

When it became apparent to the Commonwealth Court that adequate notice had not been given to policyholders and other creditors on whom the original plan would have a direct and substantial impact, hearing on the Plan's approval was continued generally. At the same time, the Court directed the Insurance Department to prepare a notice of hearing to be sent to all known policyholders and creditors indicating the procedure for obtaining the plan and raising objections prior to a Court hearing on its approval. Thereafter, many objections were made. These objections were drawn from individual policyholders, claimants against policyholders, reinsurers doing business with Mutual Fire, creditors and agents of Mutual Fire.

In early 1987, upon application of several policyholders, also objectors to the plan, the Commonwealth Court formed a Committee of Policyholders (Policyholders Committee), whose purpose was to "consult with the statutory rehabilitator on the administration of this matter and advise those represented as to the proposed plan." The Commonwealth Court formed the Policyholders Committee with the express intent of assuring that policyholders *first and foremost* suffered the least amount of harm resulting from the unfortunate series of events culminating in this insurance company's reorganization effort.

The Rehabilitator, now Commissioner Foster, thereafter filed her responses to the objections to the proposed rehabilitation plan. The Policyholders Committee and numerous other parties strenuously objected to this proposed plan on the grounds, *inter alia,* that the Rehabilitator had released no financial information or documentation to substantiate the projections of 100% payment to policyholders contained therein. Hence, the court ordered the Rehabilitator to allow the Policyholders Committee and all interested persons access to

Mutual Fire's books and records. A hearing date was then set for June 3, 1987.

At that hearing, various stipulations by and among the objecting parties (including the Policyholders Committee) were entered. The proposed plan was approved, subject to those stipulations, which altered it materially but in a manner not pertinent to this discussion.

Several months later, the Rehabilitator, pursuant to the court's Order approving the proposed plan, filed a report on the progress of the rehabilitation for the period from December 8, 1986 (the date on which the statutory Rehabilitator was appointed) to October 26, 1987. At the same time, the Rehabilitator sought additional time to evaluate the feasibility of its implementation. The court granted the Rehabilitator's request for additional time and directed her to submit to the court a schedule of tasks to be performed in order to complete the evaluation. Among these tasks were the engagement of litigation counsel to investigate possible causes of action by the Rehabilitator on behalf of Mutual Fire, Section 516(c) of the Act, 40 P.S. § 221.16(c); the appointment of a professional firm to perform actuarial analyses of Mutual Fire's loss reserves; and the engagement of auditing and claims settlement services, Section 516(b) of the Act, 40 P.S. § 221.16(b). At that time, the Rehabilitator opposed the Policyholders Committee's motion to appoint an independent manager to oversee the rehabilitation on site.

On May 2, 1988, the Rehabilitator filed her report on the feasibility of implementing the amended plan approved June 26, 1987. After close consultation, pursuant to Section 515(c) of the Act, 40 P.S. § 221.15(c), the court and Commissioner Foster determined that any viable rehabilitation of this magnitude would necessarily demand sufficient legal, managerial, financial and technical resources. It was therefore decided that initially a deputy rehabilitator would be appointed, Section 516(a) of the Act, 40 P.S. § 221.16(a), and legal counsel would be retained to investigate possible sources of recovery through litigation where litigation was deemed fruitful to

collect the recoverables comprising a significant portion of this estate's assets.

On June 1, 1988, having reviewed the Rehabilitator's report on Plan implementation, which indicated the 1987 Plan was not feasible for several reasons, the court directed the Rehabilitator to submit a modified plan. The plan was to include a provision to trigger applicable state insurance guarantee funds (both in Pennsylvania and other states) and a provision for proportionate periodic payments of policyholders' claims. Additional counsel was hired to assist the Rehabilitator in formulating a modified plan.

Thereafter, the Rehabilitator applied to the Commonwealth Court for approval to suspend payment of certain loss adjustment expenses incurred under Mutual Fire's obligations to defend its insureds. The Rehabilitator also asked the court for a determination that Mutual Fire was insolvent.

The Rehabilitator submitted a new Plan of Rehabilitation on January 31, 1989. After notice was issued to policyholders and all known creditors and was published in periodicals of general and industry circulation, numerous objections were filed. The Commonwealth Court, over the course of four days, heard testimony and argument in support of and against certain provisions of the Plan. The Commonwealth Court (Crumlish, P.J.) approved the Plan with certain modifications, and the instant appeal followed.

The Appellants in this matter are several insurance companies, policyholders and other creditors who have claims against Mutual Fire or other financial interests in the disposition of the company's assets. Specifically, the insurance companies are engaged in reinsurance or cedent[1] relationships with Mutual Fire, and the Committee of Policyholders, which has appeals at Nos. 20, 28 and 71, represents policyholders whose outstanding claims with Mutual Fire have yet to be paid.

1. Cedents are those companies whom Mutual Fire reinsures. Plan of Rehabilitation, Section I(4).

## SCOPE OF REVIEW

The General Assembly, in recognition of the specialized complexities involved in insurance generally, and in the regulation of this industry in particular, assigned the task of overseeing the management of that industry, in this Commonwealth, to the Insurance Department, the agency having expertise in that field. 40 P.S. § 41, *et seq.* The Insurance Commissioner, an appointed position pursuant to 40 P.S. § 42 is, therefore, afforded broad supervisory powers to regulate the insurance business in this Commonwealth, including the power to protect "the interests of insureds, creditors, and the public generally...." 40 P.S. § 221.1(c). Accordingly, the delegation of such caretaking authority necessarily includes exercising a direct role in the rehabilitation of insolvent insurers. Subsection (c) of Section 515 of the Insurance Act, 40 P.S. § 221.15, authorizes the Insurance Commissioner in her capacity as Rehabilitator "to take possession of the assets of the insurer ... and to administer them under the orders of the court."

Upon petition by the Commissioner to the Commonwealth Court for an Order authorizing him or her to rehabilitate an insurer pursuant to 40 P.S. § 221.15(a) and once such a rehabilitation plan has been ordered, the Rehabilitator is charged to "take such action as [s]he deems necessary or expedient to correct the condition or conditions which constituted the grounds for the order of the court to rehabilitate the insurer." 40 P.S. § 221.16(b). This mandate explicitly defers all actions to the skill of the Rehabilitator and implicitly recognizes her expertise in these matters. Additionally, the Rehabilitator is granted the power to retain those persons necessary to assist in the rehabilitation process. 40 P.S. § 221.16(a) ("Powers and Duties of the Rehabilitator").

Once the Insurance Commissioner and her deputies have designed a plan of rehabilitation it must be submitted to the Commonwealth Court for approval in order that it may have efficacy. The Commonwealth Court is empowered by the General Assembly to supervise and review the activities and proposals of the Insurance Commissioner while she under-

takes the rehabilitation of an insolvent insurer. 40 P.S. § 221.4(a); 42 Pa.C.S.A. § 761(a)(3). In overseeing the course of rehabilitation to check any abuse of discretion by the Commissioner, the Commonwealth Court is authorized to "approve or disapprove the plan [of rehabilitation] proposed, or may modify it and approve it as modified. If it is approved, the rehabilitator shall carry out the plan." 40 P.S. § 221.-16(d). Therefore, in order for the Plan to warrant the Commonwealth Court's imprimatur it must be found to be free from any abuse of the Rehabilitator's discretion.

Instantly, the Rehabilitator recommended a final, amended Plan of Rehabilitation to the Commonwealth Court on January 31, 1989. The group of policyholders designated to represent many creditors of Mutual Fire were notified of the specifics of the Plan and numerous objections were filed. After hearing several days of testimony and argument the Commonwealth Court approved the Plan with certain modifications by Order dated January 23, 1990, and we now address those objections raised against the Plan.

■ As is evident from the above referenced statutory provisions, both the Insurance Commissioner and the Commonwealth Court are obligated to interact in order to supervise, implement and regulate equitably the process engaged to rehabilitate an insolvent or financially hazardous insurer. As a result of these specific assignments, it is not the function of the courts to reassess the determinations of fact and public policy made by the Rehabilitator. Rather, the involvement of the judicial process is limited to the safeguarding of the plan from any potential abuse of the Rehabilitator's discretion. In summarizing the law of this Commonwealth concerning judicial review of the determinations made by administrative agencies, we have stated:

'It has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion *in the absence of bad faith, fraud, capricious action or abuse of power* .... That the court might have a different opinion or judgment in regard to the action of the agency is

not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion.' *Norfolk & Western Railway Co. v. Pennsylvania Public Utility Comm.* 489 Pa. 109, 128, 413 A.2d 1037, 1047 (1980) (quoting *Blumenschein v. Housing Authority*, 379 Pa. 566, 573, 109 A.2d 331, 334–35 (1954)) (emphasis added). This basic jurisprudential tenant was recently and emphatically reaffirmed by this Court in *Slawek v. Commonwealth, State Bd. of Medical Educ. and Licensure*, 526 Pa. 316, 586 A.2d 362 (1991).

It is axiomatic, therefore, that judicial discretion is not to be substituted for administrative discretion. We reaffirm *Norfolk* as the standard for determining whether or not the Insurance Commissioner abused her discretion in formulating the Plan of Rehabilitation. Upon application of the test, should the Commonwealth Court find such an abuse of discretion under the *Norfolk* standard, the Commonwealth Court is limited, by statute, to preventing any further abuse of discretion by either rejecting the plan or modifying the plan and then approving it as modified. 40 P.S. § 221.16(d).

Ordinarily, this Court's review of the Commonwealth Court's actions would be consistent with the traditional appellate review of judicial discretion exercised in a judicial proceeding which is limited to determining questions of law and whether sufficient competent evidence exists to support the exercise of discretion engaged below, as enunciated in *Ben Avon Boro. v. Ohio Valley Water Co.*, 271 Pa. 346, 114 A. 369 (1921). However, instantly we are reviewing judicial discretion exercised in an area dedicated to the expertise of a given administrative agency, the guidelines for such review of which have been narrowly and specifically stated in *Norfolk, supra.* Therefore, upon review of the Commonwealth Court's discretion, our review must be equally specific and limited in order to remain consistent with the principles of *Norfolk* that restrict judicial discretion to those instances where the agency has abused its discretion.

█ Accordingly, in order to make a reasonable evaluation of the Commonwealth Court's review of administrative agency activity, in keeping with the principles of *Norfolk*, we adopt

the following three part standard: (1) examination of whether the Commonwealth Court exceeded its statutory authority to approve, disapprove or modify the rehabilitation plan; (2) determine whether the Commonwealth Court substituted any of its own beliefs into the rehabilitation process; and (3) if so, whether the exercise of such discretion was for the prevention of further abuse by the Rehabilitator, and not to change the substance of the plan. Instantly, this limited scope of review is especially appropriate in a highly specialized industry such as insurance, where the skill, judgment and expertise of the Insurance Commissioner are statutorily recognized and deferred to, resulting in a broad scope of discretionary powers.

■ Numerous other jurisdictions in this country have also held that the decision of a Rehabilitator to rehabilitate the insolvent business of an insurer is within the sound discretion of the rehabilitator and should not be rejected by the reviewing court unless the Rehabilitator has abused that discretion. *Kueckelhan v. Federal Old Line Insurance Co.*, 74 Wash.2d 304, 444 P.2d 667 (1968); *Carpenter v. Pacific Mutual Life Insurance Co.*, 10 Cal.2d 307, 74 P.2d 761 (1937), *aff'd sub nom. Neblett v. Carpenter*, 305 U.S. 297, 83 L.Ed. 182 (1938).

In *Kueckelhan*, the applicable statute involved, Wash.Rev. Code § 48.31.040 (1989), has provisions very similar to the applicable Pennsylvania statutes.[2] There, the Rehabilitator is also directed to take possession of the assets of the insurer and to conduct the business thereof with the goal of removing the causes and conditions which made the rehabilitation necessary. In discussing the role of the courts vis-a-vis the rehabilitative conduct of an Insurance Commissioner, the *Kueckelhan* court stated:

> The courts cannot dictate or outline the general policy or course of conduct of the Insurance Commissioner or his department ..., because this outline is dependent on the terms of the applicable statutory provisions and not upon

**2.** Due to these similarities between the applicable statute in *Kueckelhan* and the statutes governing insurance rehabilitation in this Commonwealth, we find the rationale of the Washington Supreme Court to be persuasive.

judicial discretion. Our statutory provisions, therefore, properly place the responsibility on both the Insurance Commissioner and the courts, the Commissioner being required to follow the statutory mandates and to use reasonable discretion in the rehabilitation of a seized company, *with abuses of discretion to be checked by the judiciary.*

*Kueckelhan,* 74 Wash.2d at 315, 444 P.2d at 674 (emphasis added) (citations omitted). The Court in *Kueckelhan* added:

"Toward this end [the Insurance Commissioner] must be afforded that freedom of action in the over-all management of the company which will permit him to knowledgeably evaluate, plan, devise, and implement a program which in his best judgment and in keeping with his expertise in the field of insurance will accomplish the objective of the proceeding."

*Id.*

This Court has concluded that this great deference in favor of the Insurance Commissioner and the resulting narrow scope of review for the courts are in recognition of the expertise of the administrative agency or individual officer assigned the task of regulating a given industry. *See, e.g., Mathies Coal Co. v. Commonwealth, Department of Environmental Resources,* 522 Pa. 7, 559 A.2d 506 (1989); *Brocal Corporation v. Commonwealth, Department of Transportation,* 515 Pa. 224, 528 A.2d 114 (1987); *Pelton v. Commonwealth, Department of Public Welfare,* 514 Pa. 323, 523 A.2d 1104 (1987); *Pennsylvania Bankers Ass'n v. Secretary of Banking,* 481 Pa. 332, 392 A.2d 1319 (1978). Instantly, as the Plan *sub judice,* as modified, was a considered exercise of judgment on behalf of the Insurance Commissioner in her capacity as Rehabilitator and as it was thoroughly supervised and implemented with the capable assistance of the Commonwealth Court, as provided by statute, we cannot interfere with those findings or determinations made below, absent an abuse of discretion. Accordingly, for the reasons that follow, we believe the Plan of Rehabilitation, as modified by the Commonwealth Court, is a legitimate and proper exercise of the Rehabilitator's statutory powers, and properly effectuates the

intentions of the rehabilitation statutes. We, therefore, with the exception of an additional modification to Section XVII of the Plan ("Interest"), affirm the Order of the Commonwealth Court.[3]

## REHABILITATION v. LIQUIDATION

■ Appellant Allstate challenges the Plan on the basis that it more properly represents a liquidation plan and as such, it has been improperly implemented under the Rehabilitation portion of the Insurance Act. It is argued that the instant plan does not contemplate a resuscitation of Mutual Fire's operations which is one of the stated purposes of the rehabilitation statute. Further, opponents of the Plan claim it is in violation of *Neblett v. Carpenter,* 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938), in which the United States Supreme Court held that a rehabilitation plan cannot impose harsher consequences than a liquidation. Under *Neblett,* creditors must fare at least as well under a rehabilitation plan as they would under a liquidation, which Appellants currently argue, would not be the case under this Plan. We disagree and affirm the finding of the Commonwealth Court that this plan properly effectuates the goals of rehabilitation embodied in 40 P.S. § 221.14 *et seq.*

The Commonwealth Court correctly concluded that the ultimate goal of the plan *is* to have Mutual Fire reemerge as a solvent insurer. The Plan calls for Mutual Fire's possible restructure and orders that it maintain its required capital and surplus minimums required in order to resume operations in the future.

■ The rehabilitation, in order to be legitimate, does not have to restore the company to its exact original condition. So long as the rehabilitation properly conserves and equitably administers "the assets of the involved corporation in the interest of investors, the public and others, (with) the main purpose being the public good" the plan of rehabilitation is

---

**3.** We restrict our review to only those issues properly raised before, and addressed by, the Commonwealth Court. Those issues now sought to be resolved which were not raised in the Commonwealth Court are deemed to have been waived. *See* Pa.R.A.P. 302(a).

appropriate. 2A *Couch on Insurance* 2d § 22.10. The Plan as it presently appears before this Court does provide the benefits of rehabilitation such as flexibility and the accelerated disposition of claims which the Commonwealth Court properly recognized as preferable to and distinct from, the ordinary procedures of liquidation. The Commonwealth Court after an extensive and thorough analysis concluded that the plan of rehabilitation best effectuates the "legislatively stated purpose (of) 'the protection of the interest of insureds, creditors and the public generally. . . .' and the 'equitable apportionment of any unavoidable loss' through *inter alia,* 'improved methods for rehabilitating insurers . . . .' Section 501 of the Act, 40 P.S. § 221.1." *Grode v. Mutual Fire, Marine and Inland Insurance Company,* 132 Pa.Commw.Ct. 196, 207, 572 A.2d 798, 803 (1990) (quoting 40 P.S. § 221.1(c)).

Finding no meritorious challenge to the Plan on this issue, and in recognition of the validity of the goals sought and the scheme offered by the rehabilitation, we affirm the Commonwealth Court's holding that this is a legitimate plan of rehabilitation intended for the benefit of the public and not a *de facto* plan of liquidation.

In keeping with our limited and narrow scope of review we will now address *seriatim* the remaining issues raised before and resolved by the Commonwealth Court.

## IMPAIRMENT OF CONTRACTUAL RIGHTS

Several objectors to the plan assert that the Plan as proposed impermissibly impairs their various contractual rights. While this may in fact be an accurate assessment of the consequence of the proposed rehabilitation, such impairment is not a *per se* violation of law and we agree with the Commonwealth Court that any actual impairments are insubstantial.

Again, we must look to the broad powers afforded to the Commissioner granted in order to effectuate equitably the intent of the Rehabilitation statutes, i.e., to minimize the harm to *all* affected parties. As such, she has a fiduciary duty to marshall and preserve all assets of the insolvent entity. Fur-

thermore, the exigencies attendant to a major commercial insolvency and the goals of rehabilitation necessitate the reality that "individual interests may need to be compromised in order to avoid greater harm to a broader spectrum of policyholders and the public." *Vickodil v. Commonwealth, Insurance Department,* 126 Pa.Commw.Ct. 390, 396–97, 559 A.2d 1010, 1013 (1989). *See also Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).[4]

Thus, the action of the Rehabilitator fosters the legitimate public purpose of safeguarding the public interest from the potentially innumerable consequences of Mutual Fire's insol-

4. Several Appellants, including the Member Companies of the Republic Group, 24 M.D.App.Dkt.1990, allege that the setoff provisions impermissibly violate the impairment of contract provisions of both Art. I, § 10 of the United States Constitution and Art. I, § 17 of the Pennsylvania Constitution. In determining when state law may impair a contractual right, the United States Supreme Court in *Energy Reserves Group, Inc. v. Kansas Power and Light,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), established a three-part test. The threshold inquiry is to determine whether the state statute in reality has operated to substantially impair a contractual relationship. *Id.* at 411, 103 S.Ct. at 704. Should it be determined that a substantial impairment has occurred, the state must set forth a legitimate and significant public purpose. *Id.* at 412–13, 103 S.Ct. at 704–05. Once that purpose is identified, the final inquiry concerns whether the adjustment of contractual rights is reasonable and of a nature appropriate to the public purpose justifying the legislation's adoption; however, if the state is not a contracting party, deference is given to the state's enunciated purpose. *Id.*

We agree with the Rehabilitator that the instant Plan satisfies this test. The Commonwealth Court properly upheld this portion of the Plan and concluded that in order to achieve the desired consequence of satisfying all claims in an equitable and orderly manner the resulting alleged contract impairments were insubstantial. Furthermore, the significant interest on behalf of the state to regulate the fiscal affairs of its insurers for the welfare of the public would still render the Plan permissible should impairment be found to exist. It is also worthy to note that the objectors to the Plan are members of a highly regulated industry and as such were well aware of the powers of a Rehabilitator. Accordingly, the Commonwealth Court properly dismissed Appellants' challenge to the setoff provision of the Plan under the federal constitution. As our impairment of contract provision, Art. I, § 17 of the Pennsylvania Constitution, mirrors that of the United States Constitution, we are guided by the United States Supreme Courts' analysis in Energy Reserves v. Kansas Power & Light. Therefore, we adopt the same test instantly and likewise dismiss the impairment of contract challenge made under the Pennsylvania Constitution.

vency. Accordingly, we find no error or abuse of discretion with this portion of the Plan as it is legitimately designed to ameliorate a financial hazard for the good of all involved. We, therefore, affirm this portion of the Order of the Commonwealth Court.[5]

## SETOFF

■ Next, review of the Plan's setoff provisions requires a three-tiered analysis, as the provisions affect several groups of interested parties differently. Pursuant to the Insurance Act "[M]utual debts or mutual credits between the insurer and another person in connection with any action or proceeding under this article shall be set off and the balance only shall be allowed or paid . . . ." 40 P.S. § 221.32(a). This option was immediately challenged as this statutory provision allowing for setoff appears only under the liquidation portion of the Insurance Act, and thus it is argued cannot apply in support of the alleged plan of rehabilitation. As the Commonwealth Court correctly observed, this distinction "evidences an intent that rehabilitation proceedings are distinct from liquidation proceedings." *Grode v. Mutual Fire, Marine & Inland Insurance Co.*, 132 Pa.Commw.Ct. 196, 211, 572 A.2d 798, 805 (1990).

However, should the plan of rehabilitation as proposed offer significant benefits in serving the public interest, the discretionary action of the Rehabilitator should be approved absent any arbitrary or manifest abuse of discretion. Furthermore, while Pennsylvania common law has long recognized and permitted the concept of setoffs, *Dickerson v. Dickersons Overseas Company*, 369 Pa. 244, 85 A.2d 102 (1952); *In re Kenin's Estate*, 346 Pa. 127, 29 A.2d 495 (1943), their application is not mandatory. Rather, the common law right to

5. The Commonwealth Court made minor adjustments, extractions and modifications to certain provisions of the Plan, including modifications later in the Plan concerning the allegation of contractual impairment discussed above. We will address these modifications later in the opinion at the appropriate time and place. It is to be noted, however, that most of the modifications to the Plan worked to mitigate certain objections of Appellants and as such they are appropriate.

setoff, a form of contractual impairment, is an equitable right to be permitted solely within the sound discretion of the court. *In re Bell*, 147 Pa.Super. 471, 24 A.2d 101 (1942); *Abrahams v. Wilson*, 134 Pa.Super. 297, 3 A.2d 1016 (1939); *Commonwealth ex rel. Sheppard v. Central Penn National Bank*, 31 Pa.Commw.Ct. 190, 375 A.2d 874 (1977).

■ The second point of contention is raised by Mutual Fire's reinsurers alleging that the Plan improperly includes a provision prohibiting any setoff of *premium obligations due Mutual Fire.* This argument is without merit and was properly rejected by the Commonwealth Court. Existing law, in plain words, expressly forbids a setoff of premium obligations. 40 P.S. § 221.32(b)(4) states in relevant part:

> (b) *No setoff* or counterclaim shall be *allowed* in favor of any person *where:*
>
> (4) *the obligation of the person is to pay premiums,* whether earned or unearned, to the insurer.

40 P.S. § 221.32(b)(4) (emphasis added). This *express* prohibition, however, appears only in the liquidation portion of the Insurance Act. Appellants argue that since the sole location of the premium setoff prohibition is in the liquidation section, this precludes its application in a rehabilitation context. However, they fail to recognize the fundamental language of 40 P.S. § 221.32(a). That section begins by stating that the setoff provisions *apply to any action or proceeding "under this article."* 40 P.S. § 221.32(a) (emphasis added). Since the term "this article" refers to Article V of the Act of May 17, 1921, P.L. 789, *as amended,* by the Act of Dec. 14, 1977, P.L. 280, 40 P.S. § 221.1 *et seq.* which encompasses both the sections on liquidation *and* rehabilitation, the relevant provisions regarding setoffs under the liquidation section must also apply to actions proceeding under the statutory rehabilitation provisions. Additionally, the provision of the Plan expressly prohibiting a premium setoff in a *rehabilitation* context, ensures that the creditors herein, at a minimum, will fare at least as well under the rehabilitation as they would in a liquidation proceeding as mandated by the holding of *Neblett, supra.*

The goal of rehabilitation is to manage the affairs of an insolvent insurer with the intended result of restoring the entity to sound fiscal status. Instantly, it is essential that all assets flowing into the rehabilitated entity be treated preferentially in order that the insurer have an opportunity to remain afloat and survive. The statute involved implicitly recognizes this necessity to maintain and protect an insurer's principal asset, premiums due, from premature extinguishment. Therefore, the provision of the Plan denying premium setoffs is unquestionably valid and legitimately exercises the Rehabilitator's statutory powers, and thus, will properly remain undisturbed.

Next, various objectors to the Plan challenge the two definitions of setoff offered by the Plan. The first definition, referred to by some Appellants as the "basic setoff definition" or "mandatory setoff definition", provides that: "[S]etoff for purposes of this Plan shall be calculated as of December 4, 1986.[6] Balances set forth on the books of Mutual Fire shall be conclusive." The only mutual debts and credits that may be setoff against one another are those "Due and Owing[7] on December 31, 1986." *Plan of Rehabilitation* at 14. Objectors complain because this definition, limiting setoff to only those debts which are mutual, due and owing, prohibits the application of case reserves and incurred but not reported ("IBNR") claims.

The second definition under the Plan, referred to as the "optional setoff definition", provides:

E. Election of Optional Setoff Definition

1. Election. A Reinsurer who is also a Cedent may pay that amount carried on the books of Mutual Fire as current-

---

6. As originally submitted, this provision of the Plan had provided for a December 31, 1986 calculation date. This date was modified by President Judge Crumlish of the Commonwealth Court as part of his Order, modifying and approving the Plan as modified. This modification was ordered to preserve the fundamental right of the creditors to be treated, at a minimum, as well under the rehabilitation as they would in a liquidation.

7. The term "Due and Owing" is defined in Section I of the Plan as "Reinsurance recoverable on paid losses, paid Loss Adjustment Expenses, Claim Settlements and reimbursement agreements." Plan at 2.

ly due and owing within ninety (90) days after the date on which the Court enters an Order approving and confirming the Plan, in which event the Optional Setoff Definition set forth below shall apply to said Reinsurer. Balances set forth on the books of Mutual Fire shall be conclusive for this purpose.

2. *Optional Setoff Definition.* The Optional Setoff Definition shall be as follows:

Any Reinsurer of Mutual Fire who is also a Cedent to Mutual Fire will be permitted to setoff the lesser of Mutual Fire's obligations to the Cedent against the Reinsurer's obligations to Mutual Fire according to Mutual Fire's books pursuant to the following calculation:

Option Setoff Calculation [8]—The lesser of:

a. Mutual Fire's obligation to the Cedent for:

balances Due and Owing, plus reported Case Reserves, plus reported IBNR.[9]

All as computed as of December 4, 1986; or

b. The Cedent's obligation to Mutual Fire for:

balances Due and Owing, plus Case Reserves. All as computed as of December 4, 1986.

8. As President Judge Crumlish stated in his opinion concerning his modification of Section III, E.2.a of the Plan, pertaining to reinsurers who are also Cedents:
 "... [that Section] shall read so as to compute balance as of December 4, 1986, the date on which the Commissioner filed the petition for rehabilitation. Had the Commissioner petitioned for liquidation rather than rehabilitation on that date, these objector's rights would be fixed as of that filing date. Section 520(d) of the Act, 40 P.S. § 221.20(d). Thus, this Plan modification assures that those objectors receive substantially the same set off rights and treatments they would receive in a liquidation."
 *Grode v. Mutual Fire, Marine and Inland Insurance Co.,* 132 Pa. Commw.Ct. 196, 211, 572 A.2d 798, 805 (1990).

9. These terms were defined by Appellee, Insurance Commissioner as follows:
 "Case reserves are estimates of amounts required to cover future payments on account of known claims. IBNR refers to amounts predicted to be paid in the future on account of events that have occurred but have not been reported as claims to the insurer.
 Appellees Brief at 58 fn. 8.

The reinsurers again object, claiming the optional definition of setoff also fails to allow them to setoff their IBNR obligations to Mutual Fire that had not matured on the date of rehabilitation. Conversely, in support of the Plan's setoff provision and the modification made by the Commonwealth Court concerning the cut off date, the Insurance Commissioner argues: "[I]n so defining setoff, the Plan has given appropriate recognition to the traditional equitable remedy of setoff while limiting it to its appropriate scope by imposing the requirement that only matured, liquidated obligations may be setoff." Brief of Appellee at 57.

While the objections that the Plan effectively denies Appellants their right to setoff obligations to Mutual Fire that had not matured as of the time it went into rehabilitation is appealing on the surface, it bears repeating that it is a fundamental principle of Pennsylvania law that setoff is an equitable remedy and accordingly, is permissive, not mandatory. *In re Bell, supra.* Furthermore, no right of setoff can be available against a note or other obligation that does not mature until after a receiver for the insolvent debtor is appointed. *Commonwealth ex rel. Bell v. Trademen's Trust Co.,* 250 Pa. 372, 95 A. 574 (1915). *Accord Appeal of Commonwealth Trust Co. of Pittsburgh,* 324 Pa. 161, 188 A. 200 (1936).

Instantly, we find this analysis especially compelling as case reserves are not present obligations of the reinsurer. Case reserves and IBNR are at most calculations or estimates of future potential liabilities, which often times are contingent upon a later development or growth of the claim or some intervening procedure such as litigation. Their speculative and intangible nature at the time of the petition of rehabilitation does not warrant their being available for setoff against more due and owing or mature obligations.

Assuming *arguendo,* however, that a case was established to support the applicability of case reserves and IBNR to setoff, this does not necessarily automatically create such an entitlement. Once again, it is fundamental that setoff is an equitable remedy within the sound discretion of the Rehabilitator and/or

the trial court and absent an abuse of that discretion reviewing courts must refrain from involvement. In keeping with the stated intent of rehabilitation to protect and preserve the estate of the insolvent insurer for the benefit of *all* creditors, we find no error or abuse in denying the reinsurers the windfall which would result from allowing the reinsurer to offset obligations against Mutual Fire that had not matured as of the time the petition for rehabilitation was filed. The setoff is being permitted, therefore, only to the extent that it encourages and facilitates the ultimate goal of rehabilitation. Accordingly, the setoff provision of the plan and the subsequent modification and approval of that provision by the Commonwealth Court shall also remain undisturbed.[10]

### PRIORITY OF DISTRIBUTION [11]

■ Next, we examine the disposition rendered by the Commonwealth Court regarding the numerous challenges to the Plan's provision establishing the priority of distribution of claims to Mutual Fire's estate. Preliminarily, we dismiss the first challenge raised to, and addressed by, the Commonwealth Court concerning the Policyholders' objection to the Plan's June 30, 1991, cut-off date for recognition of loss claims. In order to foster the goals of rehabilitation, the Rehabilitator

10. The Commonwealth Court in modifying, then approving the setoff provision of the Plan also struck down several additional portions of the provision. First, Section III, F., limiting the maximum allowable setoff of $25,000,000 was excised from the Plan as having no explicit or implicit statutory authorization in rehabilitation or liquidation proceedings. Secondly, the Plan's provision in Section III, G., proclaiming Mutual Fire's books and records to be conclusive was also deleted due to the established inaccuracy of those books. We uphold these changes by the Commonwealth Court, pursuant to its statutory power to modify the Plan as caretaker of the Plan, and to correct potentially arbitrary and unjust provisions resulting in a more equitable procedure for all involved.

11. The Plan establishes separate classes of claims for the purpose of the priority of distribution. They are as follows:
Class 1—Secured claims; Class 2—Administrative claims of the Estate and Guarantee Associations; Class 3—Wage claims; Class 4—Policyholder claims; Class 5—Surety Bond Lender claims; Class 6—General Unsecured claims, including claims of Cedents and reinsurers; Class 7—Government claims; Class 8—Late claims; Class 9—Holders of Surplus and Contribution Notes; Class 10—Owners, Officers and Directors.

must be given the power to manage and control existing liabilities in order to reorganize and stabilize the financial structure of the insolvent insurer. We approve of the rationale engaged in by the Commonwealth Court when it opined:

We find, however, no abuse of discretion in fixing this date. Given that Mutual Fire has not written business since mid–1986, a cut-off date set five years out from the cessation of business cannot be considered arbitrary or unreasonable. Moreover, the Rehabilitator has it within her authority to seek modification of that date if she deems it inappropriate. A determination can be better made by examining loss development experience as the 1991 date approaches. Therefore, we approve the June 30, 1991 date for the submission of loss claims as contained in Section II.H and VI.G of the Plan. This Court may, however, in the future direct the Rehabilitator to submit a recommendation as to whether the date should be extended.

*Grode v. Mutual Fire, Marine and Inland Insurance Company,* 132 Pa.Commw.Ct. 196, 212, 572 A.2d 798, 806 (1990). While the consequence of this date designating a specific date beyond which the filing of loss claims is barred might work some hardships, the procedure is not inflexible and is both reasonable and necessary to manage effectively the rehabilitation of Mutual Fire for the ultimate benefit of all claimants to the estate.

The next challenge raised before and addressed by the Commonwealth Court concerns the objections of six of the ninety-one banks and financial institutions who, as surety bond lenders, allege they were improperly designated as a separate Class 5 in priority arguing that they were entitled to payment as Class 4 "policyholders." These objectors to the Plan (hereinafter "Lender Group") maintain that surety bonds are insurance policies entitling them to priority treatment under the Plan as Class 4 policyholders. They assert that because the issuance of surety bonds is regulated by the Insurance Department, the participants in Mutual Fire's bond program are entitled to the same priority of distribution under the Plan as Class 4 policyholders.

Initially, the Commonwealth Court recognized that there exist fundamental differences between bilateral contracts of insurance and tripartite surety bond agreements. It concluded that the differences between their respective premium calculations, payments, and terms and conditions of cancellation and renewal, support "the conclusion that the surety bonds are in the nature of commercial guarantee instruments rather than policies of insurance." *Id.* 132 Pa.Commw.Ct. at 213, 572 A.2d at 806.

The Commonwealth Court also rejected the previously made assertion that the fact that surety bond issuances are regulated by the Insurance Department is dispositive. Rather, the court adopted the view taken by the United States Supreme Court in *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 236 n. 19, 9 L.Ed.2d 190 (1962), wherein it stated: "Among the problems which would be raised by a contrary result would be the unsettling of the usual view, grounded in commercial practice, that suretyship is not insurance." *See* Cushman, *Surety Bonds on Public and Private Construction Projects,* 46 A.B.A.J. 649, 652–653 (1960). The Commonwealth Court correctly conclude:

> Moreover, accepting for the moment that surety bond coverage might be regarded as insurance because it is regulated by the Commonwealth insurance laws, we find no abuse of discretion in subordinating the claims of the lenders, who have recourse against investors through their own collection efforts, to those of policyholders, who will recover only what they can from Mutual Fire's estate and guarantee funds.

*Grode,* 132 Pa.Commw. at 214, 572 A.2d at 806. We find no error in the rationale and determinations employed by the Commonwealth Court regarding this issue. Thus, the Commonwealth Court's approval of the Plan's creation of a separate Class 5 subordinating the surety bond lenders claims to those of the Class 4 policyholders was appropriate.

The Plan's established priority of distribution has been further assailed by the Lender Group which objects to the creation of a Class 6 fund. Specifically, Section II, F.6.1 provides the following:

1. Creation of Class 6 fund. On or before the Effective date, a segregated account (the "Class 6 Fund") shall be established by the Rehabilitator. The Class 6 Fund shall be funded by depositing in the Class 6 Fund, from time to time, twenty-five percent (25%) of all reinsurance collected by Mutual Fire, with respect to the assumed reinsurance business of Mutual Fire. All interest earned shall be transferred to the general account of the Rehabilitator and used by the Rehabilitator as a general unliened asset of the estate of Mutual Fire.

Plan at 17.

As the court properly noted in explaining why no abuse of discretion existed on the part of the Rehabilitator in creating separate Classes 5 and 6:

[T]hese Class 5 lenders, who fall immediately behind the Class 4 policyholder but before Class 6 creditors, stand to benefit by what we perceive is an equitable innovation in the plan. Since under the Act the lenders are entitled to no higher distribution priority than general unsecured creditors, we find that the creation of Class 5 and the creation of a Class 6 segregated account are acts well within the Rehabilitator's discretion which do not violate the dictates of *Neblett.*

*Id.* 132 Pa.Commw.Ct. at 214, 572 A.2d at 807.

The objectors to this provision maintain that as Class 5 lenders, the creation of the fund inequitably demotes them to a sub-class of creditors subordinate to the Class 6 of general unsecured creditors. Because the Insurance Act prohibits the Lenders Group from attaining a higher distribution priority than general unsecured creditors, the Commonwealth Court held that the establishment of a Class 5 and the funding of a separate Class 6 account were provisions well within the Rehabilitator's broad discretion. Accordingly, the Court stated:

In sum, we find the creation of both Class 5 and Class 6 to be a proper exercise of the Rehabilitator's discretion. If, after all, insurance is to perform its function of risk assumption and distribution of loss, then those statutes which

govern it must first protect the insuring public, particularly in situations where the insurer becomes incapable of covering the risks it contracted to assume. Rehabilitation and liquidation are of vital importance to the consumer, who relies in the first place on the industry itself and then on its regulators for protection. No one can dispute that the consumer is not possessed of equal bargaining power, knowledge, or resources as that of the reinsurance entities and financial institutions which comprise the other major creditor classes in this proceeding.

*Grode,* 132 Pa.Commw.Ct. at 215, 572 A.2d at 807.

While perfection may be an unattainable characteristic of the Plan, this does not provide us with legitimate grounds for disturbing the more expert approval of provisions which are manifestly reasonable. So long as the provisions of the Plan strike a fair and proper balance between the competing secured and unsecured creditors the Plan must survive the objections raised to it.

## UNITED STATES CLAIMS

The United States government also raises an objection to the Plan, complaining of the Class 7 status to which their claims were assigned. They object, citing 31 U.S.C. § 3713 (1983), known as the Federal Priority Act which in relevant part requires that:

(a)(1) A claim of the United States *shall be paid first when*—

A) a person indebted to the government *is insolvent* . . .
31 U.S.C. § 3713(a)(1)(A) (emphasis added).

The Rehabilitator responds to this objection by arguing that the McCarran–Ferguson Act prohibits any federal statute from impairing or invalidating any state insurance regulation. 15 U.S.C. § 1012. The Act states in pertinent part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance. . . ." 15 U.S.C. § 1012(b). We refrain from deciding the question

concerning the applicability of the McCarran–Ferguson Act as did the Commonwealth Court. Suffice it to say, however, that we quote with approval both the factual determination made below and the resulting remedy temporarily ordered by the Commonwealth Court:

> Upon consideration of this objection and the Rehabilitator and other policyholders' responses thereto, we direct the Rehabilitator to set aside an amount which she finds in her discretion to be appropriate to pay United States Government claims. We further direct her to report to this Court the amount contained in this set-aside fund and will order the Plan to be so modified. We do this with the following considerations in mind.
>
> First; the Rehabilitator avers or contends that the only federal claims Mutual Fire has identified are (1) Federal Savings and Loan Insurance Corporation (FSLIC) receivership claims; (2) Environmental Protection Agency claims, "contingent and undetermined" according to the proofs of claims filed, against *insureds* of Mutual Fire; and (3) claims made by Westinghouse Electric Corporation against whom the United States may have claims. The United States does not dispute this averment that only these subrogated and third-party claims have arisen so far. We do not agree that the existence of these claims renders Mutual Fire a "person indebted to the Government," within the meaning of the Federal Priority Act. That is not to say, however, a debt due the United States could not arise, or that no federal claim *will* be filed.

*Grode,* 132 Pa.Commw.Ct. at 216, 572 A.2d at 808 (emphasis in original).[12]

## JUDGMENT CREDITORS

 Pepsi–Cola Bottling Company of Charlotte, North Carolina, Inc. (hereinafter "Pepsi"), appeals from the Com-

12. We are aware of decisions from other jurisdictions which do not recognize the McCarran–Ferguson Act as barring the federal government from obtaining first priority status in insolvency proceedings. *Matter of Union Indemnity Ins. Co. of New York,* 551 N.Y.S.2d 446, 146 Misc.2d 558 (1990) (IRS unaffected by McCarran–Ferguson Act's regulation or insurance business). Instantly, the primary federal presence

monwealth Court's approval of the plan, alleging that as a federal court judgment holder against Mutual Fire, the principle of the Full Faith and Credit Clause of the United States Constitution mandates that it be given full payment, including interest, due to an alleged superiority of its claim, irrespective of the insurance rehabilitation proceedings.

Initially, the contention by Pepsi that it is entitled to an elevated priority by virtue of its status as a federal court judgment holder is both unsubstantiated and without merit. This theory is unsupported by existing case law and neither the provisions of 40 P.S. § 221.14 *et seq.* providing for rehabilitation, nor 40 P.S. § 221.19 *et seq.* providing for liquidation, contemplate a specific elevated priority for judgment creditors. As the Commonwealth Court stated in refuting this contention: "On the contrary, the serving of a judgment does not elevate the status of such claims." *Grode*, 132 Pa.Commw. at 217, 572 A.2d at 808 (*citing Davis v. Commonwealth Trust Co.*, 335 Pa. 387, 7 A.2d 3 (1939)).

While Pepsi may not be expressly entitled to an elevated priority for purposes of Class 4 distribution, another facet of the Plan's treatment of Pepsi warrants our discussion. Pepsi alleges that its judgment, including interest, against Mutual Fire was filed on September 4, 1986, one week before the Insurance Commissioner suspended the business of Mutual

regarding claims against Mutual Fire concerns claims made by the Federal Deposit Insurance Corporation ("FDIC") and the Federal Savings and Loan Insurance Corporation ("FSLIC"). However, as the FDIC has been held not to be an integral part of the government scheme, FDIC claims have not been held to be a "claim of the United States Government," 31 U.S.C. § 3713, which would therefore be entitled to priority. *Lapadula & Villani, Inc. v. United States*, 563 F.Supp. 782 (S.D.N.Y.1983). The FSLIC, has been held, in terms of its function, as identical to FDIC. *See In re Federal Savings and Loan Insurance Corporation*, 837 F.2d 432, 434 (11th Cir.1988); *Federal Savings and Loan Insurance Corporation v. Quinn*, 419 F.2d 1014, 1017 (7th Cir.1969); *Federal Savings and Loan Insurance Corporation v. Williams*, 599 F.Supp. 1184, 1204 (D.Md.1984). As the regulation of insurance companies both solvent and insolvent has been conceded to the states and since the goal of 15 U.S.C. § 1012 was to exempt insurance activities from federal antitrust laws to preserve the state regulation of insurance companies, it would appear that the McCarran–Ferguson Act operates to preclude the applicability of the Federal Priority Act.

Fire and three months before the Commissioner filed the Petition for Rehabilitation. In approving the Plan, however, the Commonwealth Court recognized that the judgment in favor of Pepsi against Mutual Fire "is binding on and cannot be altered by the Rehabilitator." *Grode*, 132 Pa.Commw. at 217, 572 A.2d at 808. The problem concerns Section XVII of the Plan which expressly prohibits the payment of interest to creditors unless provided for in the Plan. Thus, an apparent inconsistency exists which resulted in Pepsi filing a Motion For Clarification of the Commonwealth Court's Order approving the Plan, a motion which appears to remain without a ruling.

The case relied upon by both parties, *Davis v. Commonwealth Trust Co.*, 335 Pa. 387, 7 A.2d 3 (1939), while proper authority to deny Pepsi's earlier claim of elevated priority, is not analogous for purposes of the instant dilemma concerning the viability of interest awarded. In *Davis*, the issue concerned the claim of a creditor which had been awarded a judgment against the liquidating trustee by a court *years after the liquidation started.* Pepsi's judgment entered September 4, 1986 provides:

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that on its first claim for relief, denominated First Count in the complaint, plaintiff Pepsi–Cola Bottling Company of Charlotte, Inc. have and recover of and from defendant The Mutual Fire, Marine and Inland Insurance Company the principal sum of One Million Two Hundred Thousand Dollars ($1,200,000.00), plus interest thereon at the legal rate, eight percent (8%) per annum, from and after the date of the breach, May 21, 1986, plus costs.

The Court noted that this judgment is binding, inviolate and not subject to any alteration by the Rehabilitator. We view that statement as an implied modification of the Plan's interest prohibition contained in Section XVII as respects Pepsi–Cola Company of Charlotte, Inc. While the Rehabilitator's equitable powers do afford her the authority to limit or deny interest which accrues *after a petition for*

*rehabilitation or liquidation has* been filed, the federal judgment held by Pepsi including the amounts for interest expressly provided for from May 21, 1986 must be accepted and given dignity up until December 4, 1986, the date the Insurance Commissioner sought to invoke her equitable powers pursuant to her Petition for Rehabilitation.[13]

Accordingly, we remand this issue to the Commonwealth Court for the purpose of modifying its January 23, 1990 Order, in favor of maintaining Pepsi–Cola Bottling Company of Charlotte, Inc. as a Class 4 policyholder creditor, for the full amount of the federal judgment entered on September 4, 1986, including all interest provided for between May 21, 1986 and December 4, 1986.

## LOSS ADJUSTMENT EXPENSES

Numerous claimants have objected to the Plan complaining about the provision contained therein which provides for equal sharing of loss adjustment expenses by Mutual Fire and its policyholders as of April 1, 1989. These expenses are extensive, resulting from the necessity to retain a competent staff to manage and oversee the rehabilitation, a staff of claim adjusters, claim investigators and legal counsel. While many retainer arrangements were well intended, they were entered into prior to the insolvency. Now, presented with a dire need to economize in order to survive, the Rehabilitator must lead the process, free to eliminate or reduce many of the self-serving interests involved. While the effect of the Plan may

**13.** This result, we believe, properly satisfies the results of applicable case law. Under the Full Faith and Credit Clause, Article Four, Section One of the United States Constitution, and an implementing statute, 28 U.S.C. Section 1738, Pepsi's federal court judgment is to be accepted by the states as conclusive proof of the rights adjudicated. *See Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104, *reh'g denied*, 305 U.S. 675, 59 S.Ct. 250, 83 L.Ed. 437 (1938). The result of disallowing the payment of interest on Pepsi's judgment for any period beyond the date the Petition of Rehabilitation was filed, is also consistent with those decisions wherein courts have held that interest accruing on claims after insolvency proceedings have begun is payable only after the principal on all claims have been paid in full. *American Iron and Steel Manufacturing Co. v. Seaboard Air Line Railway*, 233 U.S. 261, 266, 34 S.Ct. 502, 504, 58 L.Ed. 949 (1914); *Commw. ex rel. Woodside v. Seaboard Mutual Casualty Co.*, 420 Pa. 237, 215 A.2d 673 (1966).

cause economic suffering to some private contracting parties, we remain mindful that when an insurance company becomes insolvent, individual interests might have to be sacrificed or compromised in order to preserve the ultimate goal of this process, the overall good of the general public and the insurer's policyholders. *Vickodil v. Commonwealth Insurance Department*, 126 Pa.Commw.Ct. 390, 396–97, 559 A.2d 1010, 1013 (1989).

Accordingly, we find no error on behalf of the Commonwealth Court's modifying and approving the following portions of the loss adjustment expenses provision of the Plan. First, it is unquestionably reasonable to make modifications to the Plan which instill in it greater flexibility, mitigate some of the harsher consequences and emphasize a process of scrutiny which will guarantee a regular review of costs and expenses and a general system of accountability to the Court. We, therefore, adopt with approval the following language employed by the Commonwealth Court:

Notwithstanding these changed conditions, in order to minimize the possibility of prejudice to the policyholders whose claims Mutual Fire is obligated to defend, we will modify Section IX of the Plan and direct that loss adjustment expenses be shared equally as provided in the Plan, but not until ninety days from the date of the Order entered today. We extend the date for the reduction of full payment of loss adjustment expenses in order to minimize any adverse consequences on the defense of claims.

At the same time, we will further Order the Rehabilitator to review *all* employment and retainer agreements, including those of outside counsel and consultants employed with the Court's approval, with the aim toward renegotiation, where appropriate, and reduction of fees and expenses. It is obvious, though worth repeating, that each dollar expended in administrative and unreinsured loss adjustment costs and fees is a dollar taken away from the payment of claims. We therefore view this as a task of vital importance to the insureds and claimants and require that it be undertaken forthwith.

*Grode,* 132 Pa.Commw. at 218–19, 572 A.2d at 809 (emphasis in original).

## PROPORTIONAL PAYMENTS METHOD

Section VI of the Plan allows for interim partial payments made periodically on Class 4 Adjusted Claims (Policyholder Loss Claims and Guaranty Association Loss Claims) of $5,000.00 or less per Adjusted Claim as cash is available. After a thorough review of this provision, the Commonwealth Court approved the Plan with the following modifications: first, payments were required to be made pursuant to this provision by June 1, 1990 according to a payment schedule and schedule of distribution dates submitted for the Court's approval; second, the Court modified the Plan "so that payments of these small claims to single persons or entities with more than one claim shall be taken into account in the proportional payment program." *Grode,* 132 Pa.Commw.Ct. at 219, 572 A.2d at 809. The Commonwealth Court agreed with the Policyholders Committee that "this latter modification will minimize the preference otherwise given to policyholders with multiple claims." *Id.*

The small payment provision will accelerate the disposition of numerous claims which would otherwise develop into greater expense to the estate. The payment of small claims whether adjusted or not by the date of the order approving the plan is likewise, legitimate and reasonable. As the Commonwealth Court properly reasoned, a distinction between adjusted claims or unadjusted claims which limited payment under this provision solely to unadjusted claims, "would punish these claimants who have thus far cooperated with the estate by resolving disputes and settling claims during the pendency of these proceedings." *Id.*

## MISCELLANEOUS PROVISIONS

With regard to the Commonwealth Court's disposition of the jurisdictional issue, 40 P.S. § 221.4, we are in complete agreement. Article V of the Insurance Act simply and plainly recognizes the Commonwealth Court's exclusive jurisdiction over delinquency proceedings. 40 P.S. § 221.4(d) ("All actions

... shall be brought in the Commonwealth Court in the Commonwealth of Pennsylvania"). Accordingly, it was appropriate for the Court to strike Sections VIII(c) and (e) as being inconsistent with the provisions of that Article. Conversely, it was also proper for the Court to approve Sections (a), (b), (d), (f) and (g) as they were viewed to correctly invoke the exclusive jurisdiction of the Commonwealth Court over matters concerning the interpretation of the Plan and the rehabilitation itself pursuant to 40 P.S. § 221.4. Additionally, Section X.A, concerning dispute resolution of claims other than those subject to arbitration, was likewise approved below. The court's interpretation that the provision permits parties to a dispute to *request* the Commonwealth Court's intervention and resolution in lieu of arbitration is correct. We find no grounds for our intervention here.

## DISSOLUTION OF THE POLICYHOLDERS COMMITTEE

 Next, a large controversy surrounds the Plan's proposal to dissolve the Policyholders Committee appointed January 28, 1987 by the Court. The Commonwealth Court dissolved the Committee by Order of November 22, 1989.

The Policyholder Committee complains that not only is the Policyholder Class entitled to continued representation but that continued separate representation of the Class is necessary for adequate representation of the interests of Mutual Fire policyholders. Thus, they allege that the Commonwealth Court erred in dissolving the Committee. The Rehabilitator responds claiming that the real issue is not whether the Commonwealth Court acted improperly but whether she abused her discretion by determining that the Committee's fees and expenses should no longer be paid out of the estate of Mutual Fire after November 22, 1989. The Commonwealth Court, after thorough review of the competing positions, rejected the objection to the dissolution and concluded that those considerations of fairness which compelled the creation of the Policyholder Committee no longer existed in view of the

outrageous cost its continued presence would have on Mutual Fire's diminished estate. We agree.

The Commonwealth Court concluded, that by virtue of the instant plan and especially due to the "hardship" and "proportional payment" provisions contained therein, those parties in particular need of protection, i.e., the small policyholders, now have their interests represented and protected. *Grode*, 132 Pa.Commw. at 222, 572 A.2d at 811. This unquestionably satisfies the statutorily charged duty of the Rehabilitator to protect the interests of Mutual Fire insureds. Likewise, we adopt the rationale of the Commonwealth Court in approving its rejection of the Committee's claim that dissolution leaves the policyholders unrepresented. As President Judge Crumlish reasoned:

> As we have stated, the Rehabilitator is statutorily charged with that duty. Moreover, dissolution of the Policyholders Committee means only that this Court will not authorize payments of its costs and fees from Mutual Fire's estate. The Policyholders Committee may, as it sees fit, continue its activities outside the Court's aegis, as have the other creditors' groups known as the "lender group" and "cedents' group." Of course, individual policyholders also continue to have an opportunity to be heard.

*Id.*[14]

We next consider the Commonwealth Court's elimination of Section XIII B, the immunity provision contained in the Plan, on the basis that it was unjustified and supererogatory since no such provision in the Plan "may confer upon the Rehabilitator, her deputies or agents immunity greater than that given by Pennsylvania law as codified in Sections 8501–8528 and 8541–8564 of the Judicial Code, 42 Pa.C.S. §§ 8501–

14. The Plan, once approved should be structured to equitably address all eventualities, conflicts and concerns. As we view the Plan to most efficiently and equitably do so, the role of the Policyholder Committee as representative of policyholder interests is no longer necessary. Indeed, in view of the testimony offered regarding the Committee's numerous attempts to interfere with the Plan, ignore Orders of the Court and bill the estate of Mutual Fire millions of dollars in expenses and fees, its continued presence may be an unacceptable financial detriment.

8528, 8541–8564." *Grode* at 222–23, 572 A.2d at 811. Sections 8521 *et seq.* of the Judicial Code, 42 Pa.C.S. § 8501–8528 dealing with Sovereign Immunity, expressly enumerate the limited exceptions to the general prohibition against holding a Commonwealth Agency and any of its employees liable with respect to acts within the scope of their office or agency. The Rehabilitator and her deputies as agents of the Commonwealth are controlled by these provisions and its limitations. Accordingly, the Commonwealth Court reasonably eliminated the immunity provision as unnecessary and inconsistent with the controlling, applicable statutes regarding Sovereign Immunity.

■ Finally, we address the Plan's indemnification agreement and the Commonwealth Court's approval of this provision. First, the Policyholders Committee argues that certain employment agreements entered into by the Rehabilitator ought to be disapproved. Specifically, they seek to eliminate the employment of more than one deputy and strike those portions of the agreements with the appointed deputies and other employees which contain indemnification agreements. We agree with the Commonwealth Court, who in rejecting this contention stated that pursuant to 40 P.S. § 221.16(a) and (b) the Rehabilitator is given

> express power to "appoint a special deputy who shall have all the powers of the Rehabilitator" and who shall "serve at the pleasure of the Commissioner." In addition, the Rehabilitator "shall have full power to direct and manage, to hire and discharge employes. . . ." We do not find it unreasonable or arbitrary that the Rehabilitator has chosen to appoint a deputy and an "assistant special deputy" to implement a rehabilitation and to manage an estate of this magnitude.

*Grode*, 132 Pa.Commw.Ct. at 223, 572 A.2d at 811. We find no fault with this rationale or conclusion.

■ The Policyholders Committee also argues that indemnification agreements between the Rehabilitator and her deputies are necessarily void as against public policy, relying upon *Dilks v. Flohr Chevrolet, Inc.*, 411 Pa. 425, 192 A.2d 682

(1963), and *In re Hodgson's Estate*, 342 Pa. 250, 20 A.2d 294 (1941). First, despite these objections, the Commonwealth Court upheld the indemnity provisions and their legitimacy, distinguishing the present matter from *Hodgson's Estate, supra*, in which the rule applied in the context of testamentary trust litigation. The court held that the rehabilitation deputies do not act in the same fashion as executors or administrators in a probate context. The court then rejected the Policyholders Committees' reliance upon *Dilks, supra*, which it held did not "stand for the proposition that exculpatory clauses, which may be voided as against policy, *Boyd v. Smith*, 372 Pa. 306, 94 A.2d 44 (1953), and *indemnity* provisions receive the same treatment under Pennsylvania law." *Grode*, 132 Pa. Commw. at 224, 572 A.2d at 812 (emphasis in original). Rather, the Commonwealth Court found persuasive and relied upon the reasoning of the United States Court of Appeals for the Third Circuit in *Jamison v. Ellwood Consolidated Water Co.*, 420 F.2d 787, 789 (3d Cir.1970), to reach its conclusion that the public policy concerns regarding exculpatory clauses were not determinative of the legality of indemnity agreements. Furthermore, the court identified some valid policy concerns in support of its rejection of the Policyholders Committees' arguments and in upholding the appropriateness of the indemnity agreement, stating:

In order to attract persons of proven ability, that necessity dictates that those persons be somehow insulated from the fears and costs of possible litigation by naturally disgruntled claimants and other creditors who will inevitably suffer some loss. To this end, the Rehabilitator has adopted a reasonable policy of indemnifying her deputies for all actions within the scope of their appointed duties.

*Grode*, 132 Pa.Commw. at 225, 572 A.2d at 812.

While the Plan as modified and approved by the Commonwealth Court and as modified by this Opinion may adversely affect some individual interests, we believe that it legitimately seeks to equitably apportion unavoidable losses and is free from arbitrary or capricious provisions which would render

636

the Plan unacceptable as an abuse of the Rehabilitator's discretion.

Accordingly, after a thorough review of the objections presented and the various components of the Plan, we remand Section XVII of the Plan to the Commonwealth Court to modify that provision consistent with this Opinion. We approve the remaining provisions of the Plan as modified by the Commonwealth Court. Affirmed in part, remanded in part.

LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of this case.