M. Diane KOKEN, Insurance Commissioner of the Commonwealth of Pennsylvania

v.

FIDELITY MUTUAL LIFE INSURANCE COMPANY.

Commonwealth Court of Pennsylvania.

Heard April 19, 2006 and June 1, 2006.

Decided Aug. 29, 2006.

Thomas A. Leonard, Richard P. Limburg, and William K. Pelosi, Philadelphia, for petitioner.

Robert H. Levin, Philadelphia, for respondent.

## ORDER

OPINION BY President Judge COLINS.

The Fidelity Mutual Life Insurance Company ("FML") was placed in rehabilitation by order of this Court dated November 6, 1992, with the consent of FML's then board of directors. In the ensuing years, several plans of rehabilitation were proposed and submitted to the Court but subsequently withdrawn for various reasons. On May 22, 2002, the Rehabilitator's Third Amended Plan of Rehabilitation was, with modifications, approved by this Court. 803 A.2d 807 (Pa.Cmwlth.2002). However, due to the inability to attract sufficient bids from qualified bidders for the proposed stock life insurance corporation cre-

ated under that plan, it was eventually abandoned.

On October 25, 2005, the Rehabilitator filed with this Court a petition seeking preliminary approval of the Fourth Amended Plan for the Rehabilitation of the Fidelity Mutual Life Insurance Company (the "Plan" or "Fourth Amended Plan"). The Plan and its attachments were revised and corrected on November 23, 2005, December 20, 2005, and February 24, 2006 before the Plan was made available to policyholders.[1]

On December 2, 2005, the Rehabilitator filed a petition for approval of the form and scope of the notice of the Rehabilitator's Petition. The Policyholders' Committee objected to the scope of service of the notice. On January 18, 2006, this Court entered an Order approving the proposed form of notice and modifying the proposed scope of service to include all persons having FML policies as of the date of this Court's original order of rehabilitation. The January 18, 2006 Order was amended on January 23 and January 31, 2006 (Notice Order).

Notice of the Plan, as approved by the Court, was published on three dates in the following papers: The Patriot News, Harrisburg; The Philadelphia Inquirer, Philadelphia; U.S.A. Today (National Edition); and The Wall Street Journal (National Edition).

Notice of the Plan was also mailed on March 1, 2 and 3, 2006, pursuant to our Notice Order, by first class mail to all persons who were contractholders as of November 6, 1992; to all other claimants whose claims had not been settled or paid to the insurance regulatory authorities; to the life insurance guaranty associations and the taxing authorities of the various states where FML has contracts in force at the time of mailing the notice; to the National Association of Insurance Commissioners and the National Organization of Life and Health Insurance Guaranty; and to the Policyholders' Committee.

This Court set April 5, 2006 as the date for mailing any written objections to the Plan and set April 19, 2006 as the date for the hearing on any objections. In its Notice Order, the Court caused notice to be issued that oral objections to the Fourth Amended Plan could be made by appearing at the April 19, 2006 hearing. At the April 19, 2006 hearing, all persons having interests affected by the Plan were afforded an opportunity to be heard regarding the Plan. No oral objections were raised at the hearing, and no written objections to the Plan had been filed prior to the hearing.

At the hearing, counsel for the Rehabilitator requested the opportunity to submit affidavits in support of the Plan, and this Court continued the hearing until June 1, 2006. On June 1, 2006, this Court resumed the hearing on the Rehabilitator's petition for preliminary approval of the Plan, at which counsel for the Rehabilitator and counsel for Policyholders' Committee were present. On the motion of the

---

1. The Plan includes as attachments the following documents which are necessary for implementation of the Plan: (a) The Bid procedures Pursuant to the Fourth Amended Plan for Rehabilitation of the Fidelity Mutual Life Insurance Company; (b) the Statement of Principles for the Determination and Redetermination of Non–Guaranteed Elements Applicable to Endorsed Contracts; (c) a form of Stock Purchase Agreement; (d) a form of Merger Agreement; (e) a form of Assumption Reinsurance Agreement; (f) a form of Distributing Trust Agreement; and (g) the Profit Measures Report. Correction pages to the Plan containing technical corrections and correction pages to Plan attachments not effecting changes to the Plan were also filed by the Rehabilitator on June 22, July 19 and August 25, 2006, prior to Plan approval.

Rehabilitator's counsel, and hearing no objections, this Court accepted in evidence the affidavits and exhibits proffered by the Rehabilitator, finding the affiants' factual statements credible and their opinions persuasive. This Court also questioned Deputy Insurance Commissioner Joseph Di-Memmo concerning the Plan.

The following findings are taken from the accepted affidavits and exhibits and are distilled with modification from the proposed findings of fact submitted by rehabilitator's counsel at the invitation of the Court.[2] The findings describe salient features of the Fourth Amended Plan.

### Disposition of FML Business

The Fourth Amended Plan, as proposed, provides for the disposition of FML or its insurance business by either of two alternative transactions: (1) FML may demutualize and convert to a stock life insurance company and then transfer 100% of its common stock to a Purchaser for cash or a combination of case and Purchaser Stock, by means of a stock purchase transaction or a merger transaction; or (2) FML may sell 100% of its insurance business by transferring the policy contracts (and the assets required to support the contracts) to an assuming insurer for cash pursuant to an assumption reinsurance agreement, after which FML will eventually be dissolved.

### Bid Procedures and Bidder Criteria

Following preliminary approval of the Plan, the Rehabilitator will seek bids for 100% of the common stock of Converted FML from potential purchasers or for 100% of FML's insurance business from potential assuming reinsurers, pursuant to the Bid Procedures attached to the Plan. Under the Bid Procedures, all potential bidders will have access to the same information, be subject to the same criteria, and submit bids in a specified format. All bids will be opened at the same time and evaluated by the Rehabilitator and her advisors.

Only institutions (including insurance companies) that meet the bidder criteria set forth in the Bid Procedures may submit bids. A bidder that is an insurance company must have an A.M. Best rating of at least "A-" and capital and surplus of at least $300 million reported on a statutory basis. A bidder that is not an insurance company must have (or be eligible for) and investment grade debt or credit rating from Standard & Poor's, Moody's or Fitch IBCA, and minimum capital and retained earnings of $300 million reported on the basis of Generally Accepted Accounting Principles ("GAAP"). A bidder that is an investment company or investment fund must have minimum capital and retained earnings of $300 million on a GAAP basis, and $300 million of available equity. If a bidder is a partnership or joint venture, then each of the owners of such partnership or joint venture must satisfy the criteria that apply to insurers, non-insurance companies or investment companies; otherwise, a general partner having at least 51% of the voting and equity interest must do so. Any bidder that chooses to use Purchaser Stock as part of the consideration must have a market capitalization of at least $1 billion and be listed on the NASDAQ Global Market System or the New York Stock Exchange.

The Rehabilitator will evaluate conforming bids based on various factors, includ-

---

**2.** Because no objections to the Plan, either written or oral, were raised, and because this Court accepted as credible the Rehabilitator's proposed affidavits and exhibits, the Court granted the Rehabilitator's counsel's request to submit proposed findings of fact and conclusions of law.

ing, but not limited to: (a) the bid price and the value that will be available for distribution to Mutual Members as distributable equity at and after Closing; (b) the financial strength of the bidder; (c) the willingness and ability of the bidder to meet its obligations to move the execution of the Plan through Closing, including taking any required steps toward obtaining court and regulatory agency approvals: (d) the bidders' proposed form of transaction (i.e., stock purchase or assumption reinsurance); (e) the analysis and recommendations of the Rehabilitator's advisors; and (f) the obligations of the Rehabilitator to protect the interests of FML's insureds, its creditors, and the public generally. The Rehabilitator retains the right to reject any and all bids.

### Contract Endorsements

FML will modify all contracts by endorsement immediately before Closing on the transaction with the purchaser or the assuming insurer, as the case may be. The endorsements will (a) provide for continued compliance of the endorsed contracts with certain federal tax provisions, and (b) replace future policyholder dividends based on participation in divisible surplus with discretionary payments or additions to policy values using "Non–Guaranteed Elements (NGE)." [3]

The endorsements will be effective on the Closing Date, but the post-Closing NGE's will not take effect until the first January 1 following the Closing Date. Substituting NGE's for policyholder dividends is intended to facilitate the disposition of FML or its insurance business by making the contracts more attractive to

potential purchasers or assuming reinsurers.

The initial post-Closing NGEs will be determined and submitted to Court on petition and notice before final Plan approval. The endorsements will not change, reduce or restructure the death benefits, cash values, dividend accumulations, minimum interest rate guarantees, maximum mortality charges, policy loan accounts, or contractual loan interest rate guarantees of the contracts, and the contract account values and benefits will remain intact. An important reason for endorsing the contracts to remove mutual company features, such as the right to receive dividends if and when declared by FML's Board of Directors, is to simplify the sale and attract more potential buyers, including stock and mutual companies, to bid.

### The Plan's Statement of Principles

As noted, initial post-closing NGE's will be submitted to the Court for review prior to approval. The process of determining the initial post-closing NGE's for the endorsed contacts will be described in detail in an "Initial NGE Report," which will be prepared by FML's chief actuary and submitted to the Court.

The rules for redetermining NGE rates in subsequent years are contained in the Statement of Principles and are an integral part of the Fourth Amended Plan. Those rules are designed to provide approximately the same non-guaranteed or discretionary values after Closing as FML would have provided if it retained the contracts.

In choosing the Statement of Principles approach, the Rehabilitator considered the

---

**3.** Non–Guaranteed elements are prospectively determined credits or charges to contracts that are not fixed or guaranteed, and include such elements as credited interest rates, mortality charges, expense charges and current premiums. NGE's represent value that will be transferred at closing and thereafter to the contractholder in some form, such as cash payment, credit toward premium payment, additional paid-up insurance or interest.

additional cost, time and effort that would be involved in calculating and establishing a closed block and the practical difficulty of coordinating the establishment and approval of a closed block with the approval and implementation of the bid process under the Plan.

There are also actuarial reasons for using a Statement of Principles. The contracts in a closed block have to be sustained by specific assets that are allocated to the block. Within certain ranges, the smaller the number of contracts in the block, the less predictable the performance of the block and the greater the risk to the insurer. To adjust for this risk, smaller closed blocks such as FML's tend to be overfunded. Because the Statement of Principles approach does not allocate specific assets to the newly endorsed contracts, a greater proportion of surplus may be available to fund benefits to FML's mutual members.

The Statement of Principles specifies the NGE's that are to be adjusted for each category of business: Traditional Life; Universal Life; term life insurance; supplemental contracts not involving life contingencies; and deferred annuity, conversion funds and Reserve Fund. NGE's will be re-determined each year. At each annual redetermination after Closing, the interest credits for Universal Life, Deferred Annuities, Conversion Funds, the Retired Lives Reserve Side Fund, and dividend accumulations must be set so as to maintain the stated margin between interest credits and an average portfolio rate. Redetermining the NGEs for Traditional Life contracts involves updating the actuarial projection model used in setting the initial post-Closing NGE's for these contracts. The rules for redetermining NGEs for the Traditional Life contracts are intended to provide a relatively fixed ratio of book profits over the lifetime of the contracts.

For each year, the Company's actuary will set new assumptions for future experience going forward from the date of the redetermination. An outside actuary will verify the redetermination of NGEs in the first, third, and every fifth year after Closing.

The Statement of Principles establishes that no differences in actual experience versus anticipated experience that have occurred prior to a redetermination date are to be taken into account. This is to prevent recoupment of losses in future years.

### *Distributing Equity*

Within fourteen days after Closing, mutual members will receive a distribution from the remaining assets of the estate as compensation for the extinguishment of voting rights and other mutual members' interests. In the event of an assumption reinsurance transaction, distributable equity will consist of the adjusted surplus of FML, including the ceding commission, if any, paid by the assuming insurer and will take the form of cash. In the event of a stock transaction, distributable equity will consist of the consideration for the stock of the converted FML, and will take the form of either cash or a combination of cash and purchaser stock.

The allocation of distributable equity among mutual members will be based on two factors; voting rights and contribution to surplus. Many mutual members will not receive a share of distributable equity based on contribution-to-surplus, because their contracts do not generate a positive contribution-to-surplus as determined by the actuaries based on past policy experience and future projected policy experience. Mutual members who hold Non–Trusteed Tax–Qualified Retirement Funding Contracts will not receive distributions of cash or stock. In lieu thereof, mutual members who hold these tax-qualified con-

tracts will receive equivalent value in the form of credits to policy values.

### Distributing Trust

The Plan calls for the establishment of a Distributing Trust, which will handle the receipt, liquidation and distribution of certain assets for the benefit of mutual members entitled thereto, and the settlement and payment of retained liabilities pursuant to the Plan. The retained liabilities include certain allowed claims and post-Closing administrative expenses. To satisfy retained liabilities after Closing, the Rehabilitator will hold back the sum of $5 million from the initial distribution of distributable equity.

FML employees who are terminated at Closing will receive severance benefits in accordance with FML's existing severance policy, unless they are offered comparable employment by the purchaser or the assuming reinsurer, as the case may be.

Besides the payment of retained liabilities and the distribution of distributable equity, the Distributing Trust will transfer the shares of converted FML to the purchaser in a stock transaction and will receive the cash portion of the consideration paid by the purchaser. The Distributing Trust will be required to terminate within three years of the Closing Date.

### Release and Discharge Provisions

The Plan contains release and discharge provisions. The release runs from policyholders, creditors and mutual members to the Rehabilitator, the Commonwealth, FML, the Policyholders' Committee, and the various agents, officers, employees, outside consultants, accountants, actuaries and attorneys of the foregoing. Claims that Fidelity Mutual or the Rehabilitator may have against other parties are not released or discharged.

The release covers any and all claims relating to the development of the Plan as well as any acts or omissions during the rehabilitation period. The carve-outs from the release include: any and all obligations imposed by the Plan; any acts of fraud; any claims based on conduct subsequent to Closing; any claims to enforce the Plan; any disputed claims that are unresolved; any claims for indemnity by FML's officers or by the PHC relating to conduct during the rehabilitation; and any claims against converted FML, the Distributing Trust, and/or an assuming insurer for liabilities or obligations specifically assumed under the Plan.

### No Vote Provision

The Rehabilitator proposes that the Fourth Amended Plan will not provide for a vote with respect to any of the following: (i) the endorsement of contracts to non-participating status and the elimination of voting rights; (ii) the demutualization and conversion of FML into a stock life insurance company for purposes of a stock transaction; (iii) the transfer of the stock of converted FML to affect either a stock purchase or a merger; (iv) the dissolution of FML following the transfer of its endorsed contracts to an assuming insurer in the event of an assumption reinsurance transaction; and, (v) the method of distributing equity to any of the mutual members.

### Payment of Outstanding Claims

Substantially all pre-rehabilitation claims have been processed and the allowed amounts of those claims have been paid. To the extent there are any creditors who have not yet been paid, they will get full payment of their allowed claims, with interest at the legal rate.

### Conclusions of Law

■ The Court concludes that the Fourth Amended Plan adequately protects

the interest of contractholders, creditors, mutual members, and the public.

The Plan permits Contractholders to keep their policies without a reduction in value and benefits.

Mutual members will be fairly compensated for the loss of their mutual membership interests and will receive the full purchase price of the converted FML or 100% of FML's insurance business, net of transaction expenses and retained liabilities.

The release and discharge provisions of the Plan are essential to the successful conclusion of the rehabilitation, because it is unlikely that bidders will offer attractive prices for FML or its insurance business absent assurances that they will not be joined in rehabilitation related litigation. The Court previously approved the release and discharge provisions of the Third Amended Plan, which provisions are very similar to the release and discharge provisions of the Fourth Amended Plan.

Under the Plan, contractholders, creditors and mutual members have received or will receive at least as much as they would receive in a forced liquidation, as is required if a rehabilitation plan is to be deemed fair and equitable. *Foster v. The Mutual Fire, Marine and Inland Insurance Company*, 531 Pa. 598, 611, 614 A.2d 1086, 1092 (1992).

The Court concludes that the Plan is financially feasible, and that FML has the financial resources to meet policyholder obligations as they mature, to pay allowed claims, to pay a policyholder dividend aggregate amount of approximately $10.5 million in 2007, and to meet regulatory surplus requirements.[4]

FML's chief actuary has verified to the Court's satisfaction the adequacy of FML's policy reserves. The audited financial statements, as of December 31, 2005, indicate that FML has unassigned surplus of approximately $77.9 million on a statutory accounting basis, and approximately $79 million on a GAAP accounting basis.

The Rehabilitator has asserted that, on the advice of FML's investment bankers and financial consultants, she is satisfied that investors can be found to bid competitively for either Converted FML or 100% of FML's insurance business pursuant to the terms and provisions of the Plan and the Bid Procedures. The Rehabilitator has approved the Plan for filing with the Court.

■ This Court has exclusive original jurisdiction over proceedings to rehabilitate FML and over all parties thereto, pursuant to Article V of Insurance Department Act of 1921, May 17, P.L. 789, § 501, 40 P.S. § 221.1—221.63. Under Section 516(d) of the Insurance Department Act, the Court is vested with sole authority to approve or disapprove the Plan, or to modify the Plan and approve it, subject to appeal to our Supreme Court. 40 P.S. § 221.16(d).

The rehabilitation provisions of the Article V of the Insurance Department Act do not provide for or require a mutual member vote, a shareholder vote, or a creditor vote with respect to any aspect of a plan of rehabilitation. Instead, Section 516 of the Act, 40 P.S. § 221.16, calls for the Rehabilitator to propose a plan of rehabilitation, authorizes the Court to approve or disapprove the plan, and requires the Rehabilitator to carry out the plan if it is approved by the Court. *Mutual Fire.*

■ The Court concludes that the Plan is fair and equitable and complies with the

---

4. Over the last six years, this Court has, after notice and determination of the adequacy of FML finalized resources, approved the Rehabilitator's petitions to pay policyholder dividends of $14 million in 2006; $20 million in 2005; $30 million in 2004; $42.5 million in 2003; $65 million in 2002 and $70 million in 2001.

provisions of the Article V of the Insurance Department Act. The Plan approval process complies with the requirements of due process.

The Court further concludes that the Rehabilitator has exercised reasonable discretion and acted within her authority in the formulation of the Fourth Amended Plan and the attachments thereto. The Insurance Commissioner, designated by statute as Rehabilitator, is given "great deference" to "evaluate, plan, devise and implement a program which, in [her] best judgment and in keeping with [her] expertise in the field of insurance, will accomplish the objective of the rehabilitation proceeding." *Mutual Fire,* 531 Pa. at 612, 614 A.2d at 1093. As our Supreme Court has stated, "the Insurance Commissioner and the Commonwealth Court are obligated to interact in order to supervise, implement and regulate equitably the process" of rehabilitating an insolvent insurer. "The involvement of the judicial process is limited to safeguarding the plan from a potential abuse of the Rehabilitator's discretion." *Id.* at 609, 614 A.2d at 1091.

Given our standard of review, and based on the findings of fact and conclusions of law set forth above, we shall enter an order granting the Rehabilitator's Petition for Preliminary Approval of the Fourth Amended Plan.

### ORDER

AND NOW, this 28th day of August 2006, having heard the Rehabilitator's evidence in support of the Fourth Amended Plan of Rehabilitation for the Fidelity Mutual Life Insurance Company, and there being no objections to that Plan, the Court hereby approves the terms, conditions and provisions of the Fourth Amended Plan and the attachments thereto, and finds the same to be fair, equitable and consistent with Article V of the Insurance Department Act of 1921; provided, however, that the Rehabilitator shall not be authorized to implement the Plan or carry out the transactions contemplated by the Plan and its attachments without further order of this Court, except at set forth below:

(1) the Rehabilitator was previously authorized to review and settle claims, pursuant to this Court's February 11, 1998 Order;

(2) this Court finds the Plan's provisions for the demutualization and conversion of FML stock into a stock company and the sale of issued and outstanding stock of the converted FML to a stock purchaser, or, in the alternative, for the assumption reinsurance of 100% of FML's business by an assuming insurer, to be fair and equitable, subject to final approval pursuant to Section 10.02 of the Plan;

(3) this Court finds the Plan's provisions for the allocation of distributable equity to mutual members in exchange for the mandatory relinquishment of mutual membership interests, as set forth in the Plan, to be fair and equitable, and the same are hereby approved, subject to the filing of a further petition for approval of the "Allocation Report," pursuant to Section 4.03(b) of the Plan;

(4) this Court finds the Statement of Principles for the determination and re-determination of Non–Guaranteed Elements to be fair and equitable, and the same is hereby approved;

(5) the Rehabilitator is authorized to initiate the Plan's Bid Procedures and proceed with the selection of a purchaser or assuming insurer in accordance with those Bid Procedures herein approved by this Court;

(6) the authorization to proceed with the bid process includes authorization to accept the successful bid, if any, by signing a stock purchase agreement, merger agreement or assumption reinsurance agreement, which acceptance shall be con-

ditioned on subsequent approval of the proposed transaction by the Pennsylvania Insurance Department and this Court, on petition and notice. The Rehabilitator, FML, the converted FML and the Distributing Trust created under the Plan shall have no authority or obligation to transfer the stock of the converted FML to a purchaser or to transfer any endorsed contracts or other insurance obligations of FML to an assuming insurer without the prior approval of the proposed transaction by the Pennsylvania Insurance Department and by the Court, after petition, notice and hearing;

(7) the Rehabilitator is authorized to prepare endorsements consistent with Article III of the Plan and to seek such approvals thereof as may be required by the various state regulatory authorities, but those endorsements shall not take effect sooner than 12:01 a.m. on the Closing Date or be effective if Closing does not occur.

It is FURTHER ORDERED that all orders, injunctions and stays issued by this Court in this matter and in effect on the date of this Order shall continue in full force and effect until the Closing Date.

It is FURTHER ORDERED that, notwithstanding previous provisions of this Order, the Rehabilitator is authorized to implement the following sections of the Plan pending final approval of the Plan: Sections 2.01 ("Classification of Claims"); 2.02 ("Proof of Claims"); 2.03 ("Treatment of Allowed Claims"); 2.04 ("Interest on Allowed Claims"); 2.06 ("Estimation of Unliquidated Claims"); 2.07 ("Accord and Satisfaction"); 4.01(d) ("Disclaimed Interest"); 4.03 ("Methodology for Allocating Distributable Equity Based on Contribution to Surplus"); 4.06 ("Petition to Approve the Allocation Report"); 4.07 ("Individual Allocation Statement"); 5.01 ("Bid Process"); 8.01(c) ("Determination and Effective Date of Initial Post–Closing NGE's"); 10.02 ("Petition for Final Plan Approval"); 12.01("Policyholder Information Statement"); and the definition of "Record Date." The Rehabilitator may at any time suspend the implementation of the foregoing section of the Plan and return to the Court for appropriate directions. The aforementioned sections of the Plan shall cease to be effective if this Court enters an order refusing to grant final Plan approval, or if the Closing Date does not occur within the time provided by Section 13.01 of the Plan.

It is FURTHER ORDERED that the Rehabilitator shall promptly cause a copy of this Order to be published in the Wall Street Journal, USA Today, The Philadelphia Inquirer and the Harrisburg Patriot, twice in each publication over a two week period within thirty (30) days of the date of this Order.

The Rehabilitator shall also promptly mail copies of this Order to the same persons to whom this Court directed the Rehabilitator to mail notice of the filing of the Plan in the Court's January 18, 2006 Order and amending Orders.