**M. Diane KOKEN, Insurance Commissioner of the Commonwealth of Pennsylvania, Petitioner**

v.

**FIDELITY MUTUAL LIFE INSURANCE COMPANY, Respondent.**

Commonwealth Court of Pennsylvania.

Heard Sept. 18, 2006 and Oct. 19, 2006. Decided Dec. 6, 2006.

Thomas A. Leonard, Richard P. Limburg, and William K. Pelosi, Philadelphia, for petitioner.

Robert H. Levin, Philadelphia, for respondent.

OPINION BY President Judge COLINS.

By Order dated August 29, 2006 and amended September 19, 2006, this Court granted preliminary approval of the Fourth Amended Plan for the Rehabilitation of the Fidelity Mutual Life Insurance

Company (the "Plan" or the "Fourth Amended Plan"). In the August 29, 2006 Order, we approved the Plan's provisions for allocating distributable equity, subject to the filing and subsequent approval of an Allocation Report.

[T]his Court finds the Plan's provisions for the allocation of distributable equity to mutual members in exchange for the mandatory relinquishment of mutual membership interests, as set forth in the Plan, to be fair and equitable, and the same are hereby approved, subject to the filing of a further petition for approval of the "Allocation Report," pursuant to Section 4.03(b) of the Plan.

Section 4.03 of the Plan provides that, prior to filing a petition for final approval of the Plan, the Rehabilitator shall file a petition seeking approval of an Allocation Report describing the assumptions and calculations for allocating distributable equity among the mutual members of the company.

On June 9, 2006, the Rehabilitator filed her Petition for Approval of the Allocation Report (the Allocation Report Petition), together with a Petition to Approve the Form and Scope of Notice of the Allocation Report Petition. By Order of June 14, 2006, this Court approved the proposed scope of service and proposed form of notice of the Allocation Report Petition. In the approval Order, we set September 18, 2006 as the date for hearing any objections to the Allocation Report Petition, and directed that any written objections be filed on or before fifteen days before that date. Pursuant to our Order, the Rehabilitator sent notice of the Allocation Report Petition by first class mail to all mutual members as of the record date at their last known addresses on FML's books and records. No written objections to the Allocation Report were filed or served before the hearing on September 18, 2006.

At the hearing itself, all mutual members were afforded an opportunity to appear and be heard regarding the Allocation Report. However, no persons appeared or raised objections to the Allocation Report at that hearing. Counsel for the Rehabilitator then requested the opportunity to submit affidavits in support of the Allocation Report, and the Court continued the hearing until October 19, 2006.

At the October 19, 2006 hearing, all mutual members were again afforded an opportunity to appear and be heard regarding the Allocation Report. Again, no persons appeared or raised objections to the Allocation Report at that hearing. The Policyholders' Committee stated that it had no objection to the Allocation Report.

Prior to the hearing, on October 10, 2006, the Rehabilitator filed with the Court the affidavit of Jack Paul, Senior Vice President, Chief Actuary and Valuation Actuary of FML, and the affidavit of David Minches, Executive Director in the Insurance Actuarial and Advisory Services practice of Ernst & Young. The Rehabilitator filed these affidavits in support of the Allocation Report. Copies of the affidavits were made available for public inspection at the Office of the Prothonotary of the Commonwealth Court and at the offices of FML.

Thereafter, Mr. Paul and Mr. Minches were present at the hearing on October 19, 2006 and available for cross-examination. No one sought leave to cross-examine the Rehabilitator's witnesses on the content of their supporting affidavits. We make the following findings based on those affidavits.

### Findings of Fact

Jack Paul, the Chief Actuary of FML, developed the method of allocating distrib-

utable equity described in the Plan. He has previously opined that the allocation of distributable equity under the Plan is reasonable and complies with applicable actuarial standards of practice.

Paul also prepared the Allocation Report itself. In it, he opines that the Allocation Report complies with applicable actuarial standards and guidance, including Actuarial Standard of Practice No. 37 (June 2000), "Allocation of Policyholder Consideration in Mutual Life Insurance Company Demutualizations," and the "Report of the Task Force on Mutual Life Insurance Company Conversion," Transactions, Society of Actuaries, XXXIX.

Paul also supervised the development of the computer models used to compute Contribution to Surplus (CS Model) for purposes of allocating distributable equity to contract holders. He opines that this CS Model is consistent with actuarial practice and complies with applicable actuarial standards and guidance.

David Minches, Director of Actuarial Advisory Services for the firm of Ernst & Young, was closely involved with the development of the Allocation Report's CS Model and assisted in drafting the Allocation Report. Minches is familiar with the Report and agrees with it contents, including the opinions and conclusions that Jack Paul expresses therein. Minches opines that the Allocation Report accurately documents the CS Model, that the CS Model was properly validated, and that the Allocation Report and the CS Model meets all applicable actuarial standards.

FML's Fourth Amended Plan provides for the distribution of distributable equity to mutual members in exchange for the mandatory relinquishment of their mutual member interest. This distribution scheme is consistent with the Actuarial Standard of Practice No. 37, and the "Report of the Task force on Mutual Life

Insurance Company Conversion" from the Transactions, Society of Actuaries IIIIX, 1987, a detailed professional report concerning the allocation of stock in mutual company conversions.

FML will allocate 20 per cent (20%) of the distributable equity evenly to each of the mutual members, such that each mutual member will receive one equal allocation for voting rights, regardless of the number of contracts owned. FML will allocate 80 per cent (80%) of the distributable equity to mutual members according to how much their contracts contribute to surplus over their expected lifetimes.

Since it is not practicable to calculate the contribution to surplus of each individual contract owned by each mutual member, the actuaries have classified the mutual members' contracts into groups that have reasonable similar benefit, guarantee, and risk characteristics. Each such contract is assigned to a group that reasonably represents that contract. The actuaries then calculate the contribution to surplus of each group.

The grouping of the mutual member contracts for purposes of modeling contribution-to-surplus is an extension of FML's historical classification of contracts for purposes of pricing, dividend determination, and other financial management processes. No new classifications or reclassifications were created, although some classes were consolidated.

The classifications used in this CS Model are usual and customary for actuarial models, including actuarial models for allocating distributable equity. The methods and procedures followed by FML for allocating distributable equity to mutual members are (as has been noted) similar to, if not based on, those generally utilized for allocating stock to mutual members when mutual life insurance companies demutualize

and convert to stock companies. The Allocation Report documents this CS Model.

For purposes of the CS Model, the mutual member contracts are first classified by Line of Business as shown in FML's annual statements, and then by and Sub–Line of Business. Each Sub–Line of Business is further subdivided by valuation basis, which generally follows the years in which contracts were purchased. This is the basis that FML has historically used to determine dividends and its financial statement liabilities for each contract.

Within valuation basis, the contracts are in turn subdivided by product type or plan. The traditional premium-paying sub-line model, to cite one example, has 96 plan types in total. The CS Model then accounts for a retrospective (historic) piece and a prospective (future) piece that, when combined, provide an estimated total contribution-to-surplus for the contracts within each contract segment. The retrospective piece covers the time period from January 1, 1971 to the record date, August 31, 2001. The prospective piece covers a period of 30 and one third years, from September 1, 2001 through the year 2031. Again, the use of retrospective and prospective models is usual and customary for developing stock allocations when mutual companies demutualize and convert to stock companies.

The CS Model projects policyholder dividends and non-guaranteed elements (NGE's) to contract holders for 2007 and later years, consistent with the Fourth Amended Plan's Statement of Principles, which has been previously approved by the Court.

In both the retrospective and prospective pieces of the CS Model, product characteristics (e.g. face amount, guaranteed interest rate, cash value and premiums paid) are specified and remain largely unchanged through the projection period. Certain historical information about the contracts, such as commissions paid, dividends credited and loan balances, is known and is reflected in the retrospective model and prospective model prior to 2006.

On the other hand, assumptions are necessarily made for contract behavior and external conditions, such as mortality rates, investment earnings, taxation, contract surrenders, and expenses and other factors. Whenever possible, assumptions were based on available historical records before December 31, 2005, such as results of mortality studies, actual investment earnings rates, expenses, taxes, reinsurance costs incurred, and other similar items. For the prospective model after December 31, 2005, assumptions were set based on FML's recent experience and actuarially reasonable expectations of future outcomes.

The actuaries set the assumptions to be consistent with those used for other related actuarial projections prepared for FML, including FML's December 31, 2005 corporate projection model update and the model used in preparing the Plan's Profit Measures Report. The actuaries followed and applied appropriate actuarial and insurance industry procedures, guidance and standards in setting these assumptions and other inputs to the CS Model.

Paul opines that the assumptions for the CS model were reasonable as of the date of the Allocation Report and that nothing has since come to his attention that would indicate any material cause for concern about the validity of the CS Model results. Minches further opines that the actuarial assumptions used in the CS Model, taken as a whole, have not become stale or so outdated as to cause any material concern with the validity of the CS Model results.

The Allocation Report itself does not set forth a computation of actual allocations of

distributable equity based on contribution to surplus because such a computation can only be made after closing when the amount of distributable equity is known.[1] However, relative contributions to surplus of the contract segments have been calculated. Surplus contributions were computed by, and under the direction of, Jack Paul. Review procedures were performed by actuaries from Ernst & Young LLP, including David Minches.

The procedures Paul and Minches followed confirmed that FML followed recommended professional guidance in computing contribution to surplus and that FML used reasonable bases for selecting assumptions and performing its modeling. FML's use of a prospective (future) model element is supported by the Fourth Amended Plan's Statement of Principles.

Policy values (reserves, dividends, cash values), were reviewed by FML and Ernst & Young for reasonableness, in detail, on a sampling basis. Assumptions were reviewed in detail by FML and Ernst & Young actuaries. Individual cell results were reviewed for anomalies—by age, generation, plan, gender, rating class, etc. Corrections were made, if necessary, and results from the corrected cells were reviewed again. Comparisons were made to a sampling of cells from the FML Corporate Model. Comparisons of NGE results to prospective CS Model results for 2006 and later were made. Where possible,

reserves, cash values, loans, and dividends were validated against actual August 31, 2001 results at the plan level for permanent plans. CS Model premiums were validated against actual premiums for permanent plans. Summary cell level results were reviewed for consistency and reasonability, and "smoothing" adjustments were made where necessary.

In addition, Minches performed certain other procedures, the results of which support the accuracy of calculations and the reliability of the in-force files supporting the contribution-to-surplus computations.

We find that the opinions that Mr. Paul and Mr. Minches expressed in their affidavits and in the allocation Report are credible and are supported by the reasoning and the information provided therein.

### Conclusions of Law

Mr. Paul and Mr. Minches are professional actuaries who are experienced in life insurance, familiar with the relevant actuarial standards, practices and literature, and qualified to prepare the Allocation Report and to render expert actuarial opinions concerning the allocation of distributable equity in this case.

The opinions and conclusions that Paul expresses in the Allocation Report are credible and are supported by the information and the reasoning provided therein, by his affidavits of May 22, 2006 and Octo-

---

1. Because of initial expenses in placing most insurance contracts in force, a contract often has to be in force for many years before it makes a positive contribution to surplus. As a result, the retrospective values for many cells are negative, especially for contracts issued after 1980.

The prospective result for a cell is the present value of future book profits discounted to the Record Date.

If the sum of the retrospective and prospective contribution to surplus for a cell is negative, the mutual members who own contracts

in that cell will receive no distributable equity for contribution to surplus with respect to such contracts; they will receive distributable equity only for their voting rights.

The result for any given cell is influenced by various factors including:
· Type of plan of insurance
· Premium paying status and length of time premiums were paid
· Age at issue
· Average policy size
· Policy duration (date of issue).

ber 6, 2006, and by the affidavit of David Minches, dated October 9, 2006.

The Court accepts in evidence the Allocation Report, the affidavit of Jack Paul dated October 6, 2006, and the affidavit of David Minches dated October 9, 2006.

The Allocation Report complies with relevant actuarial standards, practices and literature.

The Rehabilitator's reliance on the Allocation Report is reasonable and within her discretion.

The terms and conditions for the distribution of distributable equity in exchange for the mutual membership interests of FML's mutual members, as set forth in the Plan and as detailed in the Allocation Report, are procedurally and substantively fair and equitable.

Therefore, based on these findings of fact and conclusions of law, we will approve the terms and conditions of the distribution of distributable equity in exchange for the mutual membership interests of FML's mutual members, as set forth in the Plan and as detailed in the Allocation Report, subject to the selection and Court approval of a successful bidder and successful bid made pursuant to the Plan, and subject further to final approval of the Plan upon petition and notice. The Allocation Report is approved *only* for use with respect to the Fourth Amended Plan for the Rehabilitation of the Fidelity Mutual Life Insurance Company.

## ORDER

AND NOW, this 6th day of December 2006, upon consideration of the Rehabilitator's Petition for Approval of the Allocation Report and any responses thereto, and hearings having been held at which all mutual members of FML were afforded an opportunity to be heard with respect to the fairness of the proposed distribution of distributable equity under the Fourth Amended Plan of Rehabilitation for FML (Plan), whether or not they filed a written objection, it is hereby ORDERED that said petition is GRANTED, and the Allocation Report is hereby approved. This Court specifically approves the terms and conditions for distribution of distributable equity in exchange for the mutual membership interests of FML's mutual members as set forth in the Plan and as detailed in the Allocation Report, and finds the same to be procedurally and substantively fair and equitable, subject (1) to the selection and Court approval of a successful bidder and successful bid made pursuant to the Plan, and (2) to final approval of the Plan upon petition and notice. The Allocation Report is approved only for use in connection with the Fourth Amended Plan of Rehabilitation.