**Joel S. ARIO, Acting Insurance Commissioner of the Commonwealth of Pennsylvania**

v.

**FIDELITY MUTUAL LIFE INSURANCE COMPANY.**

Commonwealth Court of Pennsylvania.

Heard Sept. 26, 2007.
Decided Oct. 25, 2007.

Thomas A. Leonard and Richard P. Limburg, Philadelphia and Preston Buckman, Harrisburg, for petitioner, Insurance Commission.

Edward L. Baxter, Philadelphia, for respondent, Fidelity Mutual Life Insurance Company.

Patrick Matusky, Philadelphia, for Commonwealth Annuity & Life Insurance Company.

OPINION BY Judge COLINS.

This opinion is written in support of our September 27, 2007 Orders granting the Rehabilitator's Petition for Final Approval of the Fourth Amended Plan of Rehabilitation of the Fidelity Mutual Life Insurance Company (Fidelity Mutual or FML); and granting his Petition to Approve Initial

Post–Closing Non–Guaranteed Elements for Endorsed Contracts. Joel S. Ario, Acting Insurance Commissioner of the Commonwealth of Pennsylvania, is the Statutory Rehabilitator of Fidelity Mutual, and brings these petitions before the Court.

Approval of these two Petitions constitutes the culmination of proceedings which began in November 1992, when, because of its hazardous financial condition, Fidelity Mutual was placed in rehabilitation at the request of the Insurance Commissioner and with the consent of its board of directors, pursuant to Section 514 of Article V of the Act of May 17, 1921, P.L. 789, *as amended,* known as the Insurance Department Act of 1921. 40 P.S. § 221(Act). Since that time, the Rehabilitator has, pursuant to numerous supervisory Orders of this Court, fashioned and amended four rehabilitation plans (one of which was approved by the Court before proving not to be feasible); lifted the statutorily imposed moratorium on death benefits and policy surrenders;[1] issued interim premiums to contract holders totaling over 241 million dollars;[2] declared yearly interest crediting rates, and paid Fidelity Mutual's creditors in full. Now, with preliminary and final approval of the Fourth Amended Plan of Rehabilitation (Fourth Amended Plan), Fidelity Mutual is poised to transfer its policies in force to a highly qualified assuming reinsurer, with no interruption in coverage and with distribution of substantial benefits to contract holders.

As noted, this Court preliminarily approved a previous plan of rehabilitation. *See Koken v. Fidelity Mutual Life Insurance Company,* 803 A.2d 807 (Pa. Cmwth.2002).[3] When implementation of that Third Amended Rehabilitation Plan proved unworkable due to the lack of qualified, conforming bids, the Court, by Order of December 17, 2004, directed the Rehabilitator to report by the end of the following month on alternative proposals for concluding the rehabilitation of Fidelity Mutual. It was the Rehabilitator's opinion, and that of the insurance industry experts he relied on, that many potential Fidelity Mutual investors found the preferred stock provision of the Third Amended Plan too onerous financially, and that there was a legitimate concern about the liquidity of the potential stock to be issued, as well. The Rehabilitator asked the Court for permission to engage Signal Hill Capital, LLC, a professional provider of strategic advisory and capital raising services, with extensive business valuation, merger and acquisition, and capital restructuring experience, to produce a report on rehabilitation alternatives. The report (Signal Hill Report) was submitted to the Court in April of 2005.

Following the issuance of the Signal Hill Report, the Rehabilitator submitted the Fourth Amended Plan of Rehabilitation for Fidelity Mutual (Fourth Amended Plan, or

---

**1.** We entered an Order terminating, as of October 1, 2001, the moratorium on policy surrenders, policy loans and dividend withdrawals that is authorized by Section 516(d) of the Act, 40 P.S. § 221.16(d), when a life insurance company is placed in rehabilitation.

**2.** Dividends have been paid yearly since 2001.

**3.** That plan contemplated the creation of a shell stock life insurance company to acquire the assets of Fidelity Mutual and to assume by reinsurance Fidelity Mutual's life insurance and other contract obligations. Those contracts were to be modified to delete mutual membership rights, and, in exchange, to issue preferred and common stock shares to contract holders. Through a Court-approved competitive process, a qualified bidder would then acquire for cash an amount of common stock sufficient to make it the majority stockholder in the newly created stock company.

Plan) on October 25, 2005. That Plan incorporated proposed bid procedures, a statement of principles for the treatment of non-guaranteed elements of contracts; a form stock purchase agreement; form merger and assumption reinsurance agreements; a profit measures report, and a distributing trust agreement. Revisions and technical corrections were made to the Fourth Amended Plan and, on January 31, 2006, we ordered that notice be given of the Plan and of the opportunity to file written objections or appear in Court to object to it. The Court set an April 19, 2006 hearing date on preliminary approval of the Fourth Amended Plan and caused notice to be published in papers of general circulation and mailed to contract holders, claimants, creditors and the Policyholders Committee.

A description of the Fourth Amended Plan is contained in the opinion accompanying our Order of August 28, 2006, *Koken v. Fidelity Mutual Life Insurance Company,* 907 A.2d 1149 (Pa.Cmwlth.2006), wherein, on consideration of the evidence offered in support of it, we preliminarily approved its terms, conditions and provisions and found the plan as a whole and its provisions for allocating distributable equity, for determination of non-guaranteed elements according to the Statement of Principles, and for an assumption reinsurance transaction to be fair, equitable and consistent with Article V of the Act.

Subsequently, after the requisite notice and after hearings on September 18 and October 19, 2006, we approved the Rehabilitator's Allocation Report, specifically approving the terms and conditions for distribution of distributable equity in exchange for the extinguishment of mutual membership interests, subject to selection and approval of a qualified bid.

Our August 28, 2006 Order preliminarily approving the Fourth Amended Plan di-rected the Rehabilitator to initiate the Plan's bid procedures and proceed with the selection of a purchaser or assuming insurer. Stifel Nicolaus & Company was retained, with Court approval, to serve as the Rehabilitator's investment banker for the bid process. Stifel Nicolaus solicited over 190 investors, twenty-two of whom requested Fidelity Mutual's Confidential Descriptive Memorandum. Five investors then submitted initial expressions of interest, four of whom were invited to conduct due diligence. Commonwealth Annuity, a subsidiary of The Goldman Sachs Group, Incorporated, with an A.M. Best rating of A-and capital and surplus of over $374 million, submitted a bid, offering to assume Fidelity Mutual's contracts pursuant to an assumption reinsurance agreement contemplated by the Fourth Amended Plan.

Under the assumption reinsurance agreement, Fidelity Mutual will transfer its insurance and annuity contracts (and certain additional obligations) to Commonwealth Annuity, together with assets equal to the liabilities purchased, in exchange for a ceding commission consisting of a fixed payment of $3.9 million and a contingent payment of up to $5.9 million, depending on favorable tax consideration of the transaction by the Internal Revenue Service. Fidelity Mutual's adjusted surplus, including the $3.9 million ceding commission but excluding a holdback for retained liabilities, will be distributed to mutual members through a distributing trust. The value of the transaction to mutual members is consistent with the appraisal prepared in advance of the bid process by Ernst & Young, and the Rehabilitator has obtained a fairness opinion on the transaction from his business valuation expert, Signal Hill Capital, LLC.

With a bidder in place, the Rehabilitator filed the instant Petition for final approval

of the Fourth Amended Plan of Rehabilitation and Petition for Approval of Initial Post–Closing Non Guaranteed Elements pursuant to the Plan. At the same time, the Rehabilitator asked this Court to approve the form and scope of notice of the Plan. Notice was placed in newspapers of general circulation, as well as mailed to contract holders, mutual members, creditors, the Policyholders' Committee and other interested persons by July 31, 2007. The notice contained a September 17, 2007 deadline for written objections to the Petition for Final Approval and fixed September 26, 2007 for a hearing, at which persons could appear in person to object to that petition. The Court also allowed the Rehabilitator to submit affidavits in support of the petition and required that they be made available for review by September 7, 2007.

As of the September 26, 2007 hearing date, one objection to the Rehabilitator's petition for final plan approval had been filed; fourteen objections filed to individual allocation statements were filed. These statements accompanied the final plan approval petition notice and gave estimates of the range of distributable equity to be received by individual contract holders on closing. No persons appeared at the hearing itself to object to the Rehabilitator's petitions.

*Objection of Norman Corwin to the Proposed Transaction with Commonwealth Annuity*

 Norman Corwin, M.D., objects to the selection of Commonwealth Annuity as the assuming reinsurer on the grounds of its potential financial instability. Dr. Corwin points to significant losses in one calendar year that Commonwealth Annuity has suffered; its history of mergers and acquisitions; its lack of a life insurance license in New York; the possibility of exposure to recent sub prime mortgage market losses; lack of dividends paid in 2005 and 2006; and its position as an issuer of reinsurance and annuity contracts rather than as an experienced life insurer.

The Rehabilitator has responded to Dr. Corwin individually and argues to us that his objection should be overruled. First, the Rehabilitator points out that Dr. Corwin does not object to the terms or pricing of the assumption reinsurance agreement entered into. Next, the Rehabilitator asserts that Commonwealth Annuity meets all bidder qualifications and financial criteria as outlined in the Bid Procedures approved by this Court, except that it is not licensed in New York.

First, we agree with the Rehabilitator that mergers and acquisitions are a fact of commercial life and that it would not be reasonable to disqualify bidders such as Commonwealth Annuity based on their potential for acquiring, or being acquired by, another entity.

Next, Commonwealth Annuity is rated "A-" by A.M. Best and had a statutory surplus of $397.4 million as of June 30, 2007, with an estimated risk-based capital ratio of 8 to 1. Although the bulk of its business has been in annuity products,[4] its management team has experience in life insurance. (Affidavit of M. Reardon, September 6, 2007). Commonwealth Annuity has advised Fidelity Mutual that its investment portfolio has no exposure to bonds collateralized by sub prime mortgages. (Exhibit 1, Rehabilitator's Omnibus Response, September 26, 2007). As to the $47.4 million loss reported in Commonwealth Annuity's 2006 financial statement,

4. Hence, Commonwealth Annuity's financial statements do not show policyholder dividends paid.

the Rehabilitator points out the same statement indicates that increases in income and decreases in reserve requirement more than offset that loss.

Although Commonwealth Annuity does not currently have a life insurance license in New York State, it does have a block of policies supported by assets in a custodial account, in accordance with an approved plan for underwriting of those policies pursuant to New York State Insurance Department regulations. Commonwealth Annuity will amend its New York State "Regulation 109" filing to cover the assumed New York Fidelity Mutual policies on closing. This will satisfy the Bid Procedures criteria because Commonwealth Annuity will then be duly authorized by the New York Insurance Department to administer the Fidelity Mutual policies.

Finally, the Fourth Amended Plan, as preliminarily approved, provides for payment of Non–Guaranteed Elements [5] on endorsed contracts following transfer to the assuming reinsurer, and further provides that the determination and re-determination of those NGE's will be governed by Statement of Principles incorporated in the Plan. Commonwealth Annuity has expressly acknowledged its obligations under the Statement of Principles in the assumption reinsurance agreement it has entered into with Fidelity Mutual. (Exhibit A, Petition for Final Approval of the Fourth Amended Plan, Section 2.7 and *passim* ).

Thus, having considered Dr. Corwin's objection to the transaction between Commonwealth Annuity and Fidelity Mutual,

and because we found no abuse of his discretion in the choice of Commonwealth Annuity or in the execution of the transaction, we expressly approved it in our September 27, 2007 Order.[6]

*Objections to the Individual Allocation Statements*

■ As noted, fourteen individuals lodged objections, not to the Fourth Amended Plan itself, but to the Individual Allocation Statements that were mailed to contract holders pursuant to Section 4.07 of the Plan. Each statement showed an estimated range of the amount of cash (or, in some instances, plan credit) a contract holder would receive on the initial distribution of distributable equity after Closing. Twenty per cent (20%) of distributable equity will be allocated equally among all mutual members; the remaining eighty per cent (80%) will be distributed to mutual members whose contracts have contributed to Fidelity Mutual's surplus as determined by actuarial formulae. Contributing contracts are grouped in segments, based on appropriate factors. For purposes of determining individual allocation statements, Fidelity Mutual has estimated the total amount of equity available for distribution will be between $60 million and $80 million.

All fourteen objectors challenged the ranges given in the individual allocation statements as too low or complained that some policies received an allocation while other like policies received an allocation of zero. The Rehabilitator responded to

---

**5.** Prospectively determined credits representing value that is not fixed or guaranteed that will be transferred at closing and thereafter to contract holders in some form such as cash, credit toward premium payment, additional paid-up insurance or interest.

**6.** Our Supreme Court has held that the standard of review Commonwealth Court is to

employ in evaluating a rehabilitation plan, of which the approved bid procedures are an integral part, is the abuse of discretion standard applied to administrative agency actions. *Foster v. Mutual Fire, Marine and Inland Insurance Company*, 531 Pa. 598, 614 A.2d 1086 (1992).

these fourteen objectors in writing, and has provided the Court with a response to each objection. We will not address these objections individually, but, having reviewed them and the Rehabilitator's responses to them, we find, as explained below, that the Rehabilitator has provided sound actuarial and business reasons to support the estimates given in the individual allocation statements.

First, it must be noted that all contract holders as of the record date received notice of the Rehabilitator's Allocation Report prior to the September 18, 2006 hearing on approval of it, as required by Section 4.03 of the Fourth Amended Plan. No written objections or other responses were filed prior to that hearing, and no one appeared at the hearing itself to object to the report. In addition, affidavits of Fidelity Mutual's Chief Actuary and its actuarial expert consultant from Ernst and Young were submitted and made available for inspection, and both affiants testified and were available for cross-examination at the subsequent October 19, 2006 hearing on approval of the Allocation Report. No one sought leave to examine the affiants or to otherwise challenge their affidavits.

The evidence considered at those hearings included a description of the assumptions and calculations for allocating distributable equity among mutual members, and an explanation for the actuarial basis for each of those assumptions and calculations. Witnesses also testified to the actuarial and business reasons for the grouping of mutual members' contracts for purposes of modeling contribution to surplus. On consideration of all the evidence, we found that classifications used in the contribution-to-surplus model were usual and customary for allocating distributable equity in these and similar insurance company restructuring circumstances. We also found that the Allocation Report itself complied with relevant actuarial standards and industry practices and that the terms and conditions for distribution of equity as detailed in the report were procedurally and substantively fair and equitable. We therefore granted the Rehabilitator's petition to approve the Allocation Report.[7]

Now, in his individual responses to each of the fourteen written objections, the Rehabilitator explains to those objectors with multiple policies having the same face amount that the older of their policies tend to contribute more to surplus because pricing and dividend factors for these older policies were more conservative. The Rehabilitator explains to other objectors with policies of differing face amounts (but the same age) that higher face amount policies incur lower policy maintenance expenses per unit, thus contributing more to Fidelity Mutual's surplus. Further, it is pointed out to holders of Universal Life policies or deferred annuities that the Allocation Report disclosed that 94% of the universal life contract segments made no contribution to surplus and that 100% of the deferred annuity contracts made no such contribution. We are satisfied that, both in his individual responses to these objectors and in his Omnibus Response to Written Objections in Connection with Final Plan Approval, the Rehabilitator has provided adequate explanation, backed by accepted actuarial practices, for the ranges contained in these individual allocation statements.

■ Of the fourteen objections made, there remain six objections to *corrected*

7. For a detailed description of the most salient provisions of the Allocation Report, see our Opinion of December 6, 2006. *Koken v. Fidelity Mutual Life Insurance Company,* 912 A.2d 410 (Pa.Cmwlth.2006).

allocation statements Fidelity Mutual mailed to some 495 contract holders after it was discovered that a program entry error caused an overstating of the amount of contribution to surplus on their contracts. The Rehabilitator sent out corrected statements, via overnight mail, as soon as the error was discovered. To those objecting, the Rehabilitator explained that the cause of the error was that a wrong identifier for the applicable contract segment[8] was used. (A leading zero was left off.)

It is easy to understand the frustration of policyholders who, for example, were originally advised that their allocation ranged from $2925 to $3900, only to be later told that the actual allocation was $250.00 to $350.00. (Objection of Carol L. Warren, September 17, 2007). A ninety per cent diminution in value cannot be looked on lightly. Nonetheless, we agree with the Rehabilitator that, because there is a finite pool of distributable equity created under the Fourth Amended Plan, to succumb to the temptation to require Fidelity Mutual to live with its mistake and reinstate the original allocations would be to deprive other mutual members of their rightful share.

▇▇▇ Just as important, this Court and the Insurance Commissioner "are obligated to interact in order to supervise, implement and regulate equitably the process engaged to rehabilitate an ... insurer." Thus, we are to review Insurance Department actions integral to implementation of a rehabilitation plan for potential abuses of discretion, *Foster v. Mutual Fire, Marine and Inland Insurance Company*, 531 Pa.

at 609, 614 A.2d at 1091 (Pa.1992). If the process is to be "regulate[d] equitably," then we cannot allow a program entry error to grant a windfall to some mutual members at the expense of others. Moreover, an admitted mistake is not an abuse of discretion as the law sees it. A Commonwealth agency or department abuses its discretion if it acts without any rational basis, as a result of self-dealing, bias or ill-will, or through a misapplication of the law. *Cashdollar v. Pennsylvania Horse Racing Commission*, 143 Pa.Cmwlth. 650, 600 A.2d 646 (1991). Our Supreme Court has stated that this Court "[should] not review the actions [of the Insurance Commissioner] involving acts of discretion *in the absence of bad faith, fraud, capricious action or abuse of power.*" *Mutual Fire*, 531 Pa. at 609, 614 A.2d at 1092 (emphasis in original). None of these circumstances is present here. A mistake occurred; it was corrected quickly. The objectors offer no evidence of misdealing on the part of the Rehabilitator or Fidelity Mutual officers or employees in the process.

▇▇▇ Nonetheless, the six objectors challenging their corrected Individual Allocation Statements rightly question whether an audit would not reveal other such errors in the allocation of equity to other contract segments.

At the September 26, 2007 hearing, David Minches, Executive Director in the Insurance Actuarial and Advisory Services practice of Ernst & Young, LLP,[9] testified to the review procedures employed after the mistake in the 495 Individual Allocation Statements was discovered. After Jack Paul, chief actuary of Fidelity Mutu-

---

8. The contract segment for which the erroneous entry was made was one to which "juvenile" policies were assigned. "Juvenile" as used in the contract modeling context is not a legal term of art, but refers loosely to contracts with a low issue age.

9. Ernst & Young has provided the Rehabilitator with outside advisory services in connection with actuarial aspects of the Fourth Amended Plan.

al, performed checks to verify that correct contract segment names were used for all other contributing contracts, Ernst & Young was asked to perform a review of the data and calculations used in developing the individual allocation statements. Mr. Minches' September 25, 2005 report on that review, from which he testified, was entered into the record. Mr. Minches testified that Ernst & Young developed its own set of spreadsheets to replicate every FML calculation to verify that FML's spreadsheets had the correct contribution to surplus data. Ernst & Young also reviewed the actuarial process FML used to generate its spreadsheets to verify that that process was valid and correct. In its report, Ernst & Young stated that it was able to validate that the appropriate contract segments were correctly transferred and policy-level actuarial contributions were correctly entered for Traditional and Universal Life policies; it was also able to validate that contract measures were correctly applied and policy-level actuarial contributions to surplus were correctly entered for all annuity contracts. Based on the procedures it performed, Ernst & Young reported that Fidelity Mutual "used the correct data and applied the correct formulas to calculate policy level contributions to surplus and equity share factors." (Petitioner's Exhibit No. 1, September 26, 2007). We are satisfied that this review adequately addresses the concern raised by those objectors who question the accuracy of FML's overall equity distribution methodology and procedures. We also stress that none of the fourteen objectors who have challenged their individual allocation statements have had the cash surrender or benefit amount of their policies diminished.

Having found that the preliminarily approved Fourth Amended Plan adequately protects the interests of mutual members, contract holders, creditors and the public,

that it is fair and equitable and complies with the requirements of Article V of the Insurance Department Act and with the requirements of due process, having found that the Plan Section 4.03 Allocation Report complies with relevant actuarial standards and practices and that its terms for distribution of equity are procedurally and substantively fair and equitable, and now finding that the Bid Procedures approved as part of the Plan have been complied with and that Commonwealth Annuity is a qualified bidder pursuant to those Bid Procedures, we have entered an Order granting final approval of the Fourth Amended Plan of Rehabilitation. We have also, for the reason stated above, overruled all objections to Individual Allocation Statements.